DIXIE FIRE INSURANCE CO. *v.* NELSON *et al.**

(*Jackson.* April Term, 1913.)

1. **EMBEZZLEMENT.** Acts Constituting. Statutes. Construction.

To establish embezzlement, under Shannon's Code, sec. 6576, punishing any officer, agent, or clerk of any company, or any clerk or agent of a firm or private person, who embezzles or fraudulently converts to his own use the money or property of another, which has come into his possession by virtue of his employment, it must appear that accused occupied the relation of officer, agent, or clerk, and that he fraudulently converted to his own use property of another, which came into his possession by virtue of the employment, and where the relation of debtor and creditor existed between accused and prosecutor at the time of the acts complained of there could be no embezzlement. (*Post, p.* 76.)

Code construed:    Sec. 6576 (S.).

2. **INSURANCE.** Fidelity insurance. Embezzlement. Acts constituting.

Where a general agent of an insurance company, authorized to appoint local agents, who reported to him the insurance effected by them and the amount of premiums, and remitted to him the premiums, he himself being required to report daily to the company the amount of premiums, and to make a monthly report showing balances due, which must be paid within 60 days, was permitted to deposit in his own name premiums collected and received from local agents without any objection from the company, which knew the facts and also that the general agent was the general agent of other insurance companies, and that he kept the funds of all the companies in his individual account in the banks, and checked on them all to meet the needs of his business,

---

*On the question of embezzlement as affected by belief in right to property taken, see note in 41 L. R. A. (N. S.), 556.

the agent, failing to account for premiums collected and deposited, was not guilty of embezzlement of the funds of the company, within a bond conditioned to reimburse the company for losses by embezzlement.   (*Post, p.* 76.)

Cases cited and approved:   State of Washington v. John Covert, 14 Wash., 652-657; State v. McFetridge, 84 Wis., 473; United States Fidelity & Guaranty Co. v. People's Bank, 157 S. W., 414; Williams v. U. S. Fidelity Co., 105 Md., 490; Monongahela Coal Co. v. Fidelity Co., 94 Fed., 732.

Case cited and disapproved:   Com. v. Smith, 129 Mass., 104-110.

## FROM SHELBY.

Appeal from Chancery Court, Shelby County.— FRANCES FENTRESS, Chancellor.

R. LEE BARTELS, for appellants.

T. K. RIDDICK, TURLEY & TURLEY, and R. M. HEATH, for appellee.

Mr. Chief Justice NEIL delivered the opinion of the Court.

Two records were filed in this court under the same style; one embracing the proceedings brought against the defendant named in the caption and the American Bonding Company, and the other against him and the Title Guaranty & Surety Company. These bills were brought against defendant Nelson on two bonds, executed by the respective surety companies. These bonds are substantially the same, though differently

phrased. The only point that need now be mentioned is that they promise to indemnify the insurance companies against only such misappropriation of money on the part of their agent as shall amount to larceny or embezzlement. The point may be more fully stated by quoting the following from one of the bonds, interpolating the matter in brackets for a more perfect understanding of the excerpt.

" . . . shall . . . make good and reimburse the employer [insurance company] to the extent of the sum of five thousand dollars . . . of any pecuniary loss sustained by the employer [insurance company] of moneys, securities or other personal property belonging to the employer [insurance company] in the possession or custody of the employee [Nelson], or for the possession of which he is responsible, directly occasioned by larceny or embezzlement on the part of the employee, in connection with the duties of the office or position in the service of the employer [insurance company], hereinbefore referred to [general agent]. . . .

" . . . this bond being intended only to cover such dishonest acts of the employee [Nelson] in connection with the position in the service of the employer [insurance company], hereinbefore referred to [general agent] as amount to larceny or embezzlement.

" . . . it being the true intent and meaning of this bond that the company shall be responsible only as aforesaid for moneys diverted from the employer [insurance company] through larceny or embezzlement on the part of the employee [Nelson]. . . . "

Under the contract between the general agent and his companies he was permitted to appoint his local agents in the several States in which he was allowed to operate, viz., Tennessee, Mississippi, Arkansas, and Louisiana. These agents were to report to him the insurances effected by them and the amount of premiums contracted for, and were allowed sixty days to remit to Nelson. Similarly Nelson reported the policies and the amount of the premiums daily to the chief offices of the two companies, now consolidated under the name of the complainant mentioned in the caption. Nelson was required to make a monthly report to the home offices showing balances due. These reports contained a statement of the amount of premiums due from each agency in each state; it had columns also for reinsurance canceled, and returned premiums, and reinsurance effected with sums in each. The manner in which these figures were handled in the office of the general agency may be illustrated by a report made in March, 1909, on the Tennessee agencies, thus:

Premiums ............... ................$3,973 73
Reinsurance canceled .....................   180 59
                                          ———————
                                          $4,154 32
Less returned premiums.........$1,062 59
Less reinsurance effected .......   639 05   1,701 64
                              ————————   ———————
Net premiums ..........................$2,452 68
Commissions on net premiums .............   735 80
                                          ———————
    Balance due Company ...............$1,716 88

From these reports the balances were transferred to the books of the insurance companies in the home offices. Nelson, under the contract, was allowed sixty days after the making of this monthly report within which to collect the premiums from his agents and remit to the company. The percentage allowed by the contract as compensation for the general agent was thirty per cent. on the gross premiums, and out of this Nelson was to pay his local agents. This was called a "flat" commission. There was a contingent commission of ten per cent. to be allowed at the end of the fiscal year on any profits realized on the year's transactions. The general agents, under the contract, were liable to the company for the premiums, whether collected from the local agents or not.

Under the course of business the general agents were permitted to deposit all funds collected by them on premiums in their own private accounts in banks of Memphis, and they paid the companies in their private checks. There was no specific agreement that this should be done, but it was the invariable practice.

About May, 1909, when the subject of the consolidation of the two companies—that is, the Dixie and the North State—was being agitated, objection thereto was raised by Nelson, who was a stockholder in the North State. The consolidation was effected, and he subsequently sold his stock. About June, 1909, the companies became dissatisfied with Nelson, on the ground that the agency was not profitable, and some discussion of the matter arose in the insurance papers, indicating

that the relation was to be dissolved. This angered Nelson. He also objected to the ending of his agency, claiming that he would be damaged thereby. A settlement, however, of the matter of damages was effected between Nelson and the companies by the allowance to him of a credit of $5,600. It was supposed at the time this credit was allowed that he would pay the balance due. He did not pay, and the insurance companies filed their bills as stated. That concerning the business of the North State was filed on July 29, 1910, and the bill of the Dixie on its own behalf was filed August 20, 1910, There were demurrers, and subsequently amended bills, and answers and crossbills, the particulars of which we need not go into. The result was that in the first-named case the chancellor, after allowing to Nelson a credit for the proportionate part of the $5,600, decreed against him the sum of $9,272.87 as a balance due the North State Fire Insurance Company, of which $5,000 was decreed against defendant the Title Guaranty & Surety Company on its bond, being the full amount of its penalty. In the other case, after allowing a similar credit, he decreed against Nelson, in favor of the Dixie Fire Insurance Company, $15,934.02, of which $10,000 was decreed against the American Bonding Company, being the full amount of the bond of the latter. Only the bonding companies appealed.

Many questions have been suggested and discussed in the very able briefs filed by counsel. We deem it necessary, however, to consider only one of these ques-

tions, and that is whether Nelson was guilty of embezzlement.

Our statute reads:

"Any officer, agent, or clerk of any incorporated company, or any clerk or agent of a copartnership or private person, except apprentices and other persons under the age of eighteen years, who embezzles or fraudulently converts to his own use any money or property of any other, which has come to his possession, or is under his care by virtue of such employment, shall, on conviction, be punished by confinement in the State penitentiary not less than five nor more than twenty years." Shan. Code, sec. 6576.

To make a case of embezzlement the person charged must occupy one of the relations indicated, "officer, agent, or clerk," and he must "fraudulently convert to his own use" the money or property of another person which has come into his possession, or is under his care by virtue of such employment. It is clear that, if a merely debtor and creditor relation existed at the time of the act or acts complained of, there could be no conviction under a charge of embezzlement. It may be conceded that such moneys as Nelson collected from his agents in the several States came into his hands by virtue of his agencies. We also think that the fact that he was granted sixty days in which to collect from his agents, and make remittance to the company, would not change the relation from that of agency to one of debtor and creditor.

As to that part of the contract which made Nelson liable for the premiums whether collected or not, there is authority to the effect that the relation would be simply one of debtor and creditor. *State of Washington* v. *John Covert,* 14 Wash., 652-657, 45 Pac., 304.

In this connection we are referred by counsel for complainants to the authorities upon the subject of sales of goods under a *del credere* agency. We do not think they apply. The peculiar body of law existing upon that subject has been in the main long established, and its principles are in general well settled; but it would only confuse the issue before us to attempt to apply these principles to the present controversy. It is said that *State of Washington* v. *Covert,* supra, does not apply, because the local agents in the several States were also agents of the insurance companies. In a sense they were; but their dealings were only with the general agent, and their accounts on the books in the home office were kept with him, and not with them. It is true, as already stated, that the general agent made daily reports, showing every policy issued as reports on this subject came to him from his local agents. But this was required, not that any charges might be made against these local agents, but only that accurate information might always be at hand showing the run of the general agent's business, and to enable the companies thereby to keep an eye on him. This is apparent from the correspondence between complainants and the bonding companies at the time the bonds were under way and before execution.

Aside from this, however, we are of the opinion that the manner in which Nelson was permitted to deal with the funds after they came into his hands is conclusive. It is proper, of course, for an agent to deposit the money of his principal in a solvent bank if the account shows that the money belongs to his principal. *State* v. *McFetridge,* 84 Wis., 473, 54 N. W., 1, 998, 20 L. R. A., 223. But if the agent deposits his employer's money in his own name, that is a conversion. *United States Fidelity & Guaranty Co.* v. *People's Bank,* 157 S. W., 414, Jackson, April term, 1913. If the principal knows that the agent is accustomed to making such conversion, and raises no objection to it, but accepts the agent's individual checks habitually for balances found due against the agent, he must be held as consenting to the conversion, and to the creating of the relation of debtor and creditor merely between himself and the agent, since the deposit in bank in the individual name of the agent creates the relation of debtor and creditor between the bank and the agent. The principal must be held to know that, where he consents to deposits in such manner, he agrees that the relation so based on his money deposited by the agent creates such relation of debtor and creditor between the agent and the bank, and that an indebtedness must thereupon arise from the agent to him from such use of the money. Any other view would involve the proposition that the principal could consent that the title to his funds might be vested in the bank through a loan made by the agent in his individual name to the bank, at the same time that

he would be in a situation to insist that the title still remained in himself—a manifest absurdity.

Nor is this a view based merely upon technical reasoning. It goes to the heart of the controversy. We do not gainsay the proposition that, if it be made to appear that an agent has appropriated the money of his principal to his own use, nothing else being shown, a case of fraudulent conversion is made out, under which a charge of embezzlement can be sustained. But if the principal habitually permits his agent to convert his money, by depositing it in bank in his own name, and accepts the agent's individual checks in payment from time to time, as occasion for payment arises, he must thereby be held to understand that the money is subjected to the perils of the agent's individual business, and when it is lost in that business it is then too late for the principal to bring a charge of embezzlement. That is just what happened in the present case. Nelson was agent, not only for the two companies suing here, but for several other companies. He kept the funds of all of the companies in his individual account in the banks, and checked on them all to meet the needs of his business. He lost heavily in the business of some of the other companies; there were also losses in the business which he was conducting for the two complainant companies. He drew on the general fund composing his deposit account for the conduct of his business as a general agent for all of the companies. He could not be justly charged with conscious wrongdoing when his principals, by their silent acquiescence in this

course of business, gave their sanction to the hazard which it entailed. In this view, the corrupt motive necessary to make out a case of embezzlement did not exist. 41 L. R. A. (N. S.), note, page 556.

This point is referred to in the case of *Williams* v. *United States Fidelity Co.*, 105 Md., 490, 66 Atl., 495, although it is not there given the emphasis which is here given it. See, also, *Monongahela Coal Co.* v. *Fidelity Co.*, 94 Fed., 732, 36 C. C. A., 444.

In opposition to this view we are referred to the following excerpt from *Com.* v. *Smith*, 129 Mass., 104-110, viz.: "If an agent, authorized to receive payment for goods sold by him on account of his employment, receives a check payable to his own order, the property in the check does not vest in him, and if he fraudulently converts the check or its proceeds he may be found guilty of embezzlement, although by the course of business between him and his employer he was in the habit of depositing such checks to his credit in a bank and sending his own checks in lieu thereof." But the court further said in that case (page 110): "But the jury found that the defendant had no authority to mingle the money of his employers with his own money, and so become thereby debtor for the amount belonging to them." This seems to take the point out of that case, so far as it applies to the present controversy.

We cannot doubt in the present case, from the full knowledge which the insurance companies had and the course of business referred to, the failure at any time to object to the method in which the deposits were

made, and the invariable habit of receiving his private checks, that the companies assented to the way in which the agent dealt with the fund. Indeed, Mr. Bush, the vice president of the companies, when asked about this method of payment, said, in substance, that it made no difference to the companies how they got the money, so that it was paid.

Under these facts there could be no embezzlement. Of course, there is nothing to indicate larceny. Under the terms of the bond, therefore, there could be no recovery.

The decree of the chancellor against the bonding companies is therefore reversed, and as to them the bills are dismissed, with costs.