## MARYLAND CASUALTY CO. v. PALMETTO COAL CO.

### No. 2904.

Circuit Court of Appeals, Fourth Circuit.

April 14, 1930.

H. J. Haynsworth, of Greenville, S. C. (C. F. Haynsworth and J. M. Perry, both of Greenville, S. C., on the brief), for appellant.

E. M. Blythe and P. A. Bonham, both of Greenville, S. C. (Blythe & Bonham, of Greenville, S. C., on the brief), for appellee.

Before WADDILL and PARKER, Circuit Judges, and GLENN, District Judge.

GLENN, District Judge.

This is a suit on a fidelity bond, executed by the defendant, Maryland Casualty Company, to the Palmetto Coal Company. The plaintiff, Palmetto Coal Company, is a South Carolina corporation having its principal place of business at Fountain Inn, S. C. T. D. Wood, a resident of Fountain Inn, was president and owner of the corporation and acted for it entirely, so far as the facts of this case are concerned, and we therefore use Wood's name in referring to the plaintiff, Palmetto Coal Company.

Wood had coal mines near Chattanooga, Tenn. In the summer of 1922, Wood had been selling coal in and around the city of Chattanooga through one W. T. Thrasher, who did business under the trade-name of American Coal & Coke Company. When a strike, which had obtained throughout the summer and early autumn of 1922, was over, the plaintiff found that in order to meet competition it was necessary to extend credit to buyers. He therefore entered into a contract with Thrasher to act as his agent to sell coal, to collect and remit to Wood as collections were made, but in no event later than the tenth of the month following the month of sale. The contract also provided that Thrasher should give a "Surety" bond. This contract, while not actually signed until December 5, 1922, recited:

"This contract is effective from November 1, 1922, to November 1, 1923."

Business done after November 1st was governed by this contract, and the accounts between the parties were kept according to its terms.

Thrasher, on November 1st, still owed Wood a balance on some old business, but this was all settled up by the 20th of November, 1922. In other words, on November 20, 1922, the accounts between Wood and Thrasher were balanced as of November 1, 1922, the date when both parties contemplated that the new contract as declared by its own terms was to become operative, the date from which both understood that the required bond was to become effective.

Did the bonding company fully understand this also? We think so.

Wood testified that he saw Mr. Kirkpatrick, agent for the bonding company, about the bond in the latter part of October.

At the time of filing the first application for a bond Wood and Thrasher went together to the office of Kirkpatrick & Klaus, representing the bonding company. They took with them the bond prepared by Mr. Wood's lawyer, which was the kind of bond desired.

At the same time an application was prepared to be signed by Thrasher asking for the issuance of a surety bond. In the application request was made that a surety bond be issued "to date from November 1, 1922." The issuance of the bond applied for would have protected Wood against loss caused through Thrasher's agency from November 1, 1922, to November 1, 1923.

At that time Kirkpatrick took the application from Thrasher and a questionnaire attached thereto signed by Wood. Although the application and questionnaire were dated November 4th, they were actually taken about December 5th. Kirkpatrick did not decline to write the bond applied for, but, on the contrary, according to the testimony of Wood, Mr. Kirkpatrick stated, "he saw no reason why a surety bond should not or would not be issued." The application was filled out at this time, namely December 5th. On December 7th Mr. Kirkpatrick called for a copy of the contract, which copy was furnished on December 8th. Kirkpatrick forwarded the application and the contract to the home office of the bonding company, and notified Wood that he had done so. Certainly, there was never any attempt on the part of Thrasher or Wood to mislead the bonding company or misrepresent the true state of facts. The essential facts were, namely; the bond was to cover business done under the contract of agency, effective from November 1st, and at that time (December 4, 5, 7th, and 8th, dates of negotiations) there was no indebtedness for business done prior to November 1, 1922. This was true because, as already pointed out, all indebtedness for business handled prior to November 1, 1922, had been paid on November 20th.

This application, as filed on December 16, 1922, was on a blank form furnished by the company, and was the regular application for a fidelity bond. The first application had been for a surety bond, but the bonding company had for some reason decided not to issue a "Surety" bond, but were evidently willing to issue a "Fidelity" bond to cover Thrasher's dealings under the contract between him and Wood. As the trial judge remarked in ruling on the admission of testimony, the plaintiff was bound by the policy as granted, and he could not base any recovery on the strength of a bond which was never issued, but he correctly ruled that the jury, in interpreting what the plaintiff meant and what the defendant knew that he meant by the answer given to the questions in the last application, could take into consideration all of the evidence in the case. They could take into consideration the fact that a copy of the contract was attached to the application; that Mr. Wood, in answering the questions to the first application, had considered that the questions referred to the state of Thrasher's accounts on November 1st, and that every negotiation between Wood and the agent of the bonding company had been carried on with full knowledge of the fact that the contract was to become effective on November 1, 1922. Wood thought the bond also would become effective as of that date. However, when the bond was actually delivered to Wood by the company, it stated in its own terms that it became effective on January 15, 1923, and, of course, the plaintiff is bound by that effective date. And he recognizes this in his complaint.

Thrasher continued to sell coal and collect for it up until the 23d day of April, 1923, and, during this time, he remitted $5,000 in five separate installments to Wood. According to Wood's books, the amount due for the coal shipped to Thrasher during this period was $8,601.93. From the evidence it seems that no coal was shipped to Thrasher after April 16, 1923, and that the last remittance by Thrasher was April 23, 1923. By May 14, 1923, Wood had turned the matter over to his attorney in Chattanooga. Later that summer, cross-suits were filed in the courts of Tennessee for accounting between the parties. These suits were tried together, and, as Thrasher frankly admitted on cross-examination, this trial resulted in a judgment against him in favor of Wood in a sum in excess of $6,000. Nothing was realized from this judgment, and hence this suit. The learned trial judge very properly held that the findings of the Tennessee court were not binding on him, nor was the judgment and verdict of the Tennessee court to be admitted in evidence before the jury in the trial in the District Court in South Carolina, but that any witnesses testifying in the District Court could be cross-examined as to their testimony on the previous trial in Tennessee. With this brief statement of the main facts before us, we now come to consider the appellant's contentions.

■ The appellant's first contention is that the bond was avoided by reason of the false statements contained in the application signed on December the 16th, which was the final application and the application on the strength of which the bond was issued. He

contends chiefly that the answer to two of the questions contained in this application were false, and therefore avoided the bond. The court below had correctly held that the answers to these important questions were warranties. Indeed, the trial judge said in discussing this matter:

"If they (the answers) were false in a substantial respect so as to mislead the party in reference to a material matter, they would avoid the policy itself." (R. 10).

These questions are numbers thirteen and fourteen. Question thirteen was as follows:

"13. (a) Has applicant always faithfully, honestly and punctually accounted to you for all moneys and property heretofore under his control or custody as your employee? a. Yes.

"(b) Are applicant's accounts at this date in every respect correct, and proper securities, property, and funds on hand to balance his accounts? b. Yes."

He claims that the categorical "yes" was false, and therefore avoids the bond. We do not think that, under the contract between Thrasher and Wood, this was an erroneous answer, for the reasons outlined below in dealing with the answers to question number 14. The second question, the chief one involved is number fourteen, which is as follows:

"14. (a) Is applicant now in debt to you? a. Account balanced to November 1, 1922.

"(b) If so state amount and nature of such indebtedness and if secured, how? b. No indebtedness."

The answers to these questions must be construed in the light of their relation to the whole application, and attendant negotiations. The application was dated December 16th, and was an application for a bond to take effect on November 1st. The bond was to secure the plaintiff from loss by reason of larceny or embezzlement, growing out of the relations between Wood and Thrasher during the life of that contract. Mr. Wood clearly meant, when he answered the questions, and what the bonding company clearly understood him to mean, was this:

"Today, December 16th, Mr. Thrasher owes me nothing for business done prior to November 1st."

Instead of answering this question with the one word "yes," Wood revealed the true status of the account when he said "account balanced to November 1, 1922." Wood was reporting to the company that there was no indebtedness due back of November 1st, and that therefore he and Thrasher were starting off on a clean slate as of that date. Thrasher was to pay the premium from November 1st, the bond was to become effective from that date, and the answers to the questions contained in the application must be understood in the light of what was in the minds of all parties, Wood, Thrasher, and bonding company alike, namely, that the liability under the bond would date from November 1st, the date the new relation between Wood and Thrasher came into being. Wood testified as follows:

"All the communications that I had would lead me or any other man to understand that the bond would be issued on November 1st. In view of that, on December 16th, I had nothing in mind whatever but November 1st, at which time we had all agreed with the agent of the Company to make the bond effective."

After all of this, the bonding company made no further inquiries as to the truth of statements made by Wood before the issuance of the bond, and the bond, when issued, was effective from and after January 15, 1923. When the bonding company put this effective date in, they were charged with the knowledge that the contract had been running for two months and fifteen days and, had they wished any further information as to what had developed between Wood and Thrasher during that time, they could have demanded it from either of these parties. They were satisfied, however, with the application and the information which it contained. There is no evidence that Wood purposely misrepresented any facts or withheld any information. He was intending to give them a statement of the facts as they existed on December 16th, with reference to business done up until November 1st, the date of his new contract with Thrasher.

"Fraud is not to be presumed. To establish it the evidence must be clear, unequivocal, and convincing, which means there must be sufficient competent evidence, as distinguished from mere suspicion, to satisfy the court trying the question." United States v. Mammoth Oil Co. (C. C. A.) 14 F.(2d) 705, 717.

The trial judge therefore correctly refused to direct a verdict on this ground, and properly submitted this phase of the case to the jury under a full and fair charge as to

false statements in the application for a bond. He also fully covered the effect of concealment of material facts in the validity of the bond. This was more favorable to the appellant than the facts of the case demanded, because no reasonable person could draw the inference that Wood was concealing any material facts in his answer. He intended to give a true picture of the facts as they existed, with reference to November 1, 1922. His answers revealed that condition correctly, and the bonding company could not have understood it otherwise. They cannot now escape liability by contending that these answers could possibly be construed in some other way. These answers must be construed in the plain and unambiguous words used, and in light of all the attendant circumstances. And certainly the rule of construction is not to let the bonding company, writing such bonds for hire, escape liability on a far-fetched interpretation of language. The rule is rather the other way. American Surety Co. v. Pauly, 170 U. S. 133, 18 S. Ct. 552, 42 L. Ed. 977; United States F. & G. Co. v. Golden Brick Co., 191 U. S. 416, 24 S. Ct. 142, 48 L. Ed. 242.

See, also, Guarantee Co. v. Mechanics Sav. Bank & Trust Co., 80 F. 766, at page 772. A Tennessee case before the C. C. A. of 6th Circuit.

We find another very similar case from the Tennessee District Court. There a verdict rendered against a bonding company on a fidelity bond, under circumstances very similar to the case at bar, was upheld by the Circuit Court of Appeals of the Sixth Circuit. Chief Justice Taft and Justice Lurton were members of the court at that time. Supreme Council v. Fidelity & Casualty Co., 63 F. 48, 59. Also see Title Guaranty & Surety Co. v. Nichols, 224 U. S. 349, 32 S. Ct. 475, 56 L. Ed. 795; Hormel v. Bonding Co., 112 Minn. 288, 128 N. W. 12, 33 L. R. A. (N. S.) 515.

The next general contention of the appellant is that the evidence was insufficient to submit to the jury on the question of embezzlement. This contention is that there is no liability under the bond, even though valid, because Thrasher was not guilty of larceny or embezzlement.

The testimony shows the way in which the business had been carried on between Wood and Thrasher previous to November 1st, but, be that as it may, there is no doubt that, on November 1st, the relation between Wood and Thrasher became that of principal and agent. The contract so stated. The fact that there was no change in the way the letter heads were written, or the bills made out, is insignificant compared with the plain terms of the contract into which they had entered. The bonding company had a copy of the contract for examination before it issued the bond.

The appellant cites and relies strongly upon the case, Dixie Fire Insurance Co. v. Nelson, 128 Tenn. 80, 157 S. W. 416, 418. The appellant contends that, under the principle of this decision, Thrasher cannot be held guilty of larceny or embezzlement in the case at bar. We think, however, that here we find such a different state of facts from those in the case cited that the trial judge properly submitted the question of embezzlement to the jury. We agree that in the absence of a formal written contract governing particular transactions a principal may, by long acquiescence in continued conversion, be estopped from denying that he acquiesced in such conduct. But here the questions of whether or not Wood knew of this conduct and whether or not he had acquiesced in it were questions which the trial judge properly submitted to the jury. In the Tennessee case cited, it appears that a number of principals acquiesced in the well-established custom, known to all of the principals, of allowing their agent, by his course of conduct, to change his relation from that of agent to that of debtor. But here Wood emphatically denied that he knew that Thrasher was mingling his funds with those of other principals, and, indeed, he testified that he did not know that Thrasher was selling coal for any other coal company. The question of Wood's knowledge and Thrasher's intent were alike questions, which, under a conflict of testimony, were properly submitted to the jury.

A reading of the portion of the judge's charge which deals with the question of embezzlement and larceny under the Tennessee decisions shows that he gave full credence to the cases introduced by the appellant, and undoubtedly charged the law in language very favorable to the appellant on this proposition. The portion of the charge dealing with this matter is as follows:

"In connection with this bond, however, read in the light of the contract, my view of the law is this: That Thrasher was required to transmit the funds which he collected upon coal sold for the plaintiff without delay and that the mere placing of the money in bank for the purpose of transmitting it would not be sufficient to change the character of principal and agent into that of debtor

and creditor if that was all that was done. I charge you, however, that if the Palmetto Coal Company knew that Thrasher placed the money in there and held it there other than for immediate transmission as that contract required, if they became aware of the fact that he mingled it with the funds of other companies, if he did so, that would not be embezzlement, if he afterwards checked out this money, which was due the Palmetto Company, to some of these other companies, with whose accounts he had mingled it, because when it was put in bank there without earmarks under the decision of the Tennessee court, I am sure, if it were so placed there with knowledge of the plaintiff, it would be beyond the possibility of the Tennessee law to charge him with embezzlement, whatever else it might be; and mind you, that only embezzlement and larceny are covered in this bond."

To our mind, this charge put the plaintiff to a higher degree of proof to make out embezzlement than is required by the general principles of law, in most jurisdictions, which govern the matter of embezzlement growing out of fiduciary relationships. The law everywhere puts the burden of honest dealing upon fiduciaries. We do not construe the Tennessee cases cited as laying down any such broad principle which would make the gentle art of embezzlement and breach of trust by fiduciaries an easy pastime in the great state of Tennessee. Nor do the authorities cited in 41 L. R. A. (N. S.) p. 556, give any support to this contention. The cases cited there are in support of the general principle that when an agent, under an honest belief that money is due him, appropriates this particular money to his own use, he may be guilty of a simple conversion and civilly liable, without becoming guilty of larceny or embezzlement. But it is pointed out there that the questions of the bona fides and intent are generally questions for the jury. Certainly here, so far as the amount which the plaintiff has recovered in this action, there can be no doubt but that Thrasher clearly understood that on April 23, 1922, he, in his fiduciary capacity, had, or had used, money which belonged to his principal in at least the amount of $3,601.93, which was the amount used by the jury as its basis of calculation. We have studied the Nelson Case carefully, and we point out that the decision there turns upon the admitted knowledge that a number of principals had of their joint agent's conduct and their long acquiescence therein. Another very pertinent fact is that the money for which Nelson (the

agent in the Tennessee case) failed to account to two principals had been used to pay to other principals who stood in a like relation. The opinion is in part:

"Nelson was agent, not only for the two companies suing here, but for several other companies. He kept the funds of all of the companies in his individual account in the banks, and checked on them all to meet the needs of his business. He lost heavily in the business of some of the other companies; there were also losses in the business which he was conducting for the two complainant companies. He drew on the general fund composing his deposit account for the conduct of his business as a general agent for all of the companies. He could not be justly charged with conscious wrongdoing when his principals, by their silent acquiescence in this course of business, gave their sanction to the hazard which it entailed. In this view, the corrupt motive necessary to make out a case of embezzlement did not exist. 41 L. R. A. (N. S.) note, page 556."

The facts of the case at bar are so different that the District Judge correctly held that the principle of the Nelson Case would not justify a directed verdict here.

■ The third general contention of the appellant is that, conceding the validity of the bond and conceding the misconduct on the part of Thrasher generally, the evidence is so indefinite as to the amount embezzled that the verdict of the jury, so far as the amount is concerned, was the result of speculation and surmise, and could have no reasonable basis. In this connection, we point out that Wood brought to the jury all of his books.

The plaintiff, in its program of proof as to the amount which Thrasher had collected for the account of Palmetto Coal Company, introduced a number of witnesses who testified as to amounts of coal which they had purchased from Thrasher during the currency of the contract, and a large part of this was handled during the currency of the bond. The plaintiff, through its complaint, contended that the amount collected and embezzled was $6,053.10; on trial he reduced the amount claimed to a little over $5,000.

One of the witnesses for the plaintiff was John Chrosniak. Mr. Chrosniak was bookkeeper for the Federal Coal Company of Chattanooga, a concern which was in the same line of business. He, therefore, was familiar with the matter of bookkeeping between the coal companies, and their selling agents. He testifies about transactions which took place between his company and Thrash-

er. Of these transactions he had personal knowledge, by reason of having handled them. It also appears from his testimony that he was called upon to check over the accounts, as evidenced by the books of the Palmetto Coal Company in its dealings with Thrasher. He testifies positively that the result of his computation was that between December 29, 1922, and April 16, the shipments amounted to $8,601.93. He further testifies that the credits from January 29th up to and including April 23, amounted to $5,000. The jury was evidently impressed with this expert testimony by Mr. Chrosniak, and took his calculations as a basis for finding their verdict. It was within their province to take Chrosniak's figures under all of the facts and circumstances of the case, or to take the other figures as submitted by the plaintiff, or to take the figures as testified to and argued to them by the appellant. In connection with Chrosniak's testimony, we must take the testimony of Thrasher himself. He admits that he had testified in a previous suit in Tennessee when his mind was much fresher on the matter. It was shown that he had admitted at that time, when his recollection was fresh, that he had collected the sum of about $6,000, which he had not remitted. He had claimed a credit against this of $1,400 or $1,500. So even if we take Thrasher's own testimony, we find that the jury has found a verdict against his surety for just about the same amount that he admitted that he had collected and not turned over to his principal. The charge of the trial judge stated clearly to the jury that the plaintiff could only recover the amount embezzled during the currency of the bond plus interest from May 16, 1924. A check of this calculation shows that the jury took Chrosniak's computation of the amount due, added interest, and thus arrived at their verdict of $4,671.53.

Wood's bookkeeper also testified as to the business handled during the time covered by the bond, and her testimony corroborated that of Chrosniak. The contract provided that the retail sales were to be made on a thirty-day basis, and the testimony was that this custom was followed. In this connection, we point out that Thrasher did not testify as to exact dates of collection, nor did he bring his books to trial. He explained that they were lost, and the bona fides of this explanation was for the jury to consider. Wood gave the jury the benefit of all books, records, and computations.

A similar method of calculation was used by this court in Citizens' Trust Co. v. Globe & Rutgers Insurance Co., 229 F. 326, Ann. Cas. 1917C, at p. 419. There this court, with Judge Woods writing the opinion, corrected the amount of a verdict, using the same method of calculation.

In failure of Thrasher or the defendant bonding company to deny these records or to explain them, the jury was entitled to take them as a basis for their calculations. The appellant, by involved figuring, attempts to show that the verdict as found by the jury may be wrong in the exact amount. While it is possible that some of the parties buying the coal from Thrasher paid him between December 29 and January 15, and while it is possible that Thrasher's books might have shown this, his testimony, and that of the defendant generally, does not show this, and, therefore, since there is found in the plaintiff's testimony a reasonable and firm basis for arriving at the amount which the jury agreed upon, it must be allowed to stand.

On the whole case, we think that the trial judge properly refused to direct a verdict for the defendant and submitted proper questions to the jury under a proper charge, and that therefore the verdict and judgment must be affirmed.

Affirmed.

WADDILL, Circuit Judge, presided at the hearing of this case and concurred in the conclusion reached, but, owing to illness, did not participate in the preparation of the opinion.