Plaintiff sues for an accounting as to monies allegedly due him in consequence of his employment under a written contract as a life insurance solicitor by defendant and for a monied judgment in an amount to be determined by such accounting. The claim for an accounting is based upon the fact that plaintiff had been soliciting insurance under this contract for a number of years; that he had secured a large volume of life insurance policies and that, under said contract, he was entitled to certain renewal commissions that were payable over a period of ten years from the dates of the issuance of the respective policies.
Defendant denied any indebtedness to plaintiff on the ground that plaintiff's employment was terminated on May 23, 1933; that the event which resulted in the termination of plaintiff's employment on said date was the action of plaintiff in appropriating to his own use two premium payments on life insurance policies collected by him; that this appropriation constituted a violation of the terms of the contract, which obligated plaintiff to immediately pay over such collections to defendant, and that such breach of contract on the part of plaintiff bars recovery thereunder.
After the hearing of testimony on behalf of each party, the lower court entered an interlocutory judgment directing the defendant to render to plaintiff the accounting petitioned for and reserving decision upon the merits of the controversy. Accordingly, defendant filed an accounting *Page 149 
as ordered, reserving all of his rights under the answer previously filed, wherein the grounds in resistance of liability are set forth.
The matter was thereafter submitted for decision on the merits upon the testimony presented prior to the interlocutory judgment, with some admissions involving minor corrections in the accounting filed.
The court below rendered judgment in favor of plaintiff and against defendant for the amount of $1,063.32, plus legal interest on individual items of this principal amount from their respective due dates, subject to the seizure of plaintiff's interest in this suit on an execution issued against him in the case of L. Feibleman Co., Inc., v. Bernard S. Borie, No. 237,021 of the First City Court of New Orleans. See Act No. 85 of 1928. The judgment of the lower court also contains certain reservations in favor of plaintiff as to amounts accruing after December 31, 1939, the terminal date of the accounting had herein. From this judgment defendant has appealed.
As this litigation arises out of a written contract between the parties, we should first direct ourselves to the provisions thereof in order to determine the rights and liabilities of each.
The original written contract between the parties was executed on July 25, 1917, for a term of ten years. On July 1, 1927, the parties entered into a second written contract, which governed their relationship from that date up to its termination in May, 1933. There exists no essential differences between the provisions of these two contracts pertinent to this controversy, and the question of liability here must be determined solely by the provisions of the latter contract.
Referring thereto, this written agreement evidences the employment by defendant of plaintiff "as his agent to procure applications for life insurance, to deliver policies, to collect premiums when furnished with policies or receipts; and to perform such other duties as may be required in connection therewith".
In connection with plaintiff's services as an insurance solicitor, certain payments by defendant to plaintiff were provided for, consisting of "commissions", which represented a specified number of premiums paid for the first year on policies issued upon applications procured by plaintiff, and the "renewal commissions", or "renewals", which represented a specified percentage of the amount of the premium paid for the second and subsequent years (but not beyond the tenth year) on such policies. Quoting from the pertinent provisions of the contract, and noting that the term "party of the first part" refers to defendant, the term "party of the second part" to plaintiff, and the term "party of the third part" to the Union Central Life Insurance Company (the latter not a party to this suit, nor its rights and obligations under these contracts at issue here), we find the following dealing with the payment of "renewals":
"Renewal Commissions — That as the renewal premiums are collected and reported in cash, the party of the first part will pay to the party of the second part, during the continuance of this contract, renewal commissions at the rates specified on the preceding page, not to exceed, however, on the business of each year, the number of renewals hereinafter provided, depending upon the amount of paid-for business personally secured by the said second party during each year, either under this or former contract.
"For $50,000 of paid-for business, renewal commissions for nine years:"
The foregoing provision immediately precedes the provisions under which the right of plaintiff to renewals is based and which read as follows: "5. Renewal Rights — That the party of the first part will pay the balance of the renewal commissions above provided, less a collection fee of one per cent of the renewal premiums, in the event of the death or total disability of the party of the second part; or, if the party of the third part withdraws from the aforesaid territory; or in the event of the cancellation of this contract at the option of the parties of the first or third parts; or in event of the voluntary retirement of the party of the second part."
The contract further provides:
"11. Collections — That all moneys collected or received for or on behalf of the Company shall be securely held in trust, and shall not be used for any personal or other purpose whatsoever, but shall be immediately turned over to the party of the first part or his authorized representative. That any misappropriation of funds in any manner whatever shall without further notice work an immediate termination of this contract and an unconditional forfeiture of all of the second party's interest *Page 150 
and rights hereunder accrued or to accrue. * * *"
"15. Termination — That this contract shall be terminated in event of the death or total disability of the party of the second part; or if the party of the third part shall withdraw from the territory assigned, or should be prevented, for any cause, from doing business therein.
"That this contract may be terminated at the option of the party of the second part; or at the election of the party of the first or third part, if the party of the second part shall fail to perform any of his agreements as herein expressed, or shall make any misrepresentation of the policy contracts; or shall make or offer to make any rebate directly or indirectly; or shall fail to secure, deliver and pay for in any calendar year an amount of insurance satisfactory to the Company."
Referring to the pertinent facts in the history of the relationship between plaintiff and defendant and the events leading up to the abrogation of the contract in 1933, it appears that, from the accounts filed in evidence, defendant from time to time made advances to plaintiff which were charged against him on defendant's books. It also appears from these accounts that the "commissions" and "renewals" accruing to plaintiff were credited to him on this account, as they were earned, by virtue of the payment of the premiums, out of which they came. It is shown that on June 30, 1932, due to his financial obligations, plaintiff executed written assignments in favor of Iberville Trust 
Savings Bank and F.W. Reiners, respectively, hypothecating to these two creditors, in the order named, all of his rights in "commissions" and "renewals" with respect to all insurance policies secured by him prior to the date of such assignments, but subject to the right of defendant to be reimbursed the amount due him by plaintiff before these named assignees would be entitled to receive any payments thereunder. These two written assignments bear the signed acknowledged receipt thereof by defendant, and defendant further acknowledges therein that he "will make payment in accordance therewith * * *". In other words, these assignments instructed defendant, after he had been reimbursed any amount due him by plaintiff, to pay directly to the named assignees all amounts accruing to plaintiff under the contract of January 1, 1927, and during a period of ten years thereafter, but covering only such insurance policies secured by plaintiff prior to June 30, 1932, such assigned amounts being payable first to the Iberville Trust Savings Bank, until paid in full, and thereafter to Reiners.
As a consequence of these assignments, it is shown that the account of plaintiff on the books of defendant was segregated into two separate accounts. One of these is termed "original", or "old account". This account shows that, from and after July 1, 1932, all "commissions" and "renewals" accruing to plaintiff on policies obtained by him prior to that date (hence, within the scope of the assignments) would be applied to the reimbursement of the creditors therein named. It is shown that the pledges evidenced by these assignments were discharged in full, in so far as plaintiff's indebtedness to defendant was concerned, and that substantially all of the amount due to the Iberville Trust 
Savings Bank has likewise been paid, but that nothing had been paid on the pledge to Reiners. Plaintiff does not contest the correctness of the showing made by defendant in the accounting rendered under these assignments. In view of the fact that these pledges made by the plaintiff had not been discharged, the district court did not concern itself therewith — and it is conceded that we need not — in so far as determining whether any amount is due thereon to plaintiff. The judgment below reserved plaintiff's rights for a further accounting at such time as the pledged creditors will have been paid in full.
Following the June 30, 1932 assignment, with its correlative "original" or "old account", a new account styled "new account No. 2" was opened on the books effective July 1, 1932. This account thereafter served as the general account current between plaintiff and defendant, embracing the advances made by defendant to plaintiff from and after that date and the amounts accruing to plaintiff on insurance policies procured by him from and after that date, and, hence, not within the scope of the assignments.
It appears that, on October 25, 1932, a third account was opened with plaintiff, known as "new account No. 3", in consequence of plaintiff's indebtedness to certain banking institutions, wherein plaintiff authorized defendant to pay these banks, pro rata, any commissions accruing to him on certain specified applications for insurance policies which he had obtained and which were then pending. It is conceded, however, that the commissions flowing from *Page 151 
these specified insurance policies were insufficient to pay these creditor banks in full, and this "account No. 3" reflects no claim by plaintiff against defendant.
The record discloses, and, in fact plaintiff admits, that several days prior to the termination of his employment he collected and retained two premium payments aggregating $245.13. Following a conversation between plaintiff and defendant over the collection and retention of these premium payments, plaintiff's employment was from thence on terminated, as is evidenced by a letter addressed by defendant to plaintiff, dated May 23, 1933, and reading as follows:
"This is to advise you that your contract with this Company isterminated as of today. You are not to make any further collections on behalf of this Company or the writer or solicit any business.
"Kindly turn over to Mr. Ziegler, the office manager, all supplies, keys and papers of the Company in your possession." (Italics ours.)
The fundamental question at issue, therefore, is whether, under the contract provisions and the circumstances surrounding and following the termination of the contractual relationship between the parties, plaintiff is entitled to collect from defendant "commissions" and "renewals" accruing from premiums paid after the termination of this contractual relationship on May 23, 1933, on policies issued prior to this termination upon applications procured and submitted by plaintiff. It is conceded by both parties that, if plaintiff is entitled to these "commissions" and "renewals" (the bulk of the amount in controversy being made up of "renewals") accruing after May 23, 1933, there is no controversy between the parties either as to the correctness of the accounting made by the defendant, or the percentage of the premiums to which he is entitled, and, therefore, there exists no question as to the amount of the judgment. In other words, it is conceded that the amount fixed by the judgment as owing to plaintiff by the defendant is correct as of December 31, 1939, in the event that we should hold that these "commissions" and "renewals" constitute a liability in favor of plaintiff by defendant.
At the outset we may observe that the basis of defendant's contention of forfeiture of "renewals" was that plaintiff had collected two certain premiums from policyholders of the company which he had "misappropriated and converted to his own personal use and failed to pay over to defendant". Defendant urges that the forfeiture provision in paragraph 11 of the contract is self-operative, and, once the misappropriation is proven, it worked a forfeiture, ipso facto not only of "renewals" already accrued at the time, but any which might accrue thereafter.
In the case of Curran Treadaway, Inc. v. American Bonding Company, 193 La. 763, 192 So. 335, 337, the Supreme Court observed that "there can be no presumption of dishonesty. In the absence of proof to the contrary, the presumption is that every person is honest", and laid down this general statement of the law: "It is to be observed that while every act of embezzlement involves a shortage, every shortage does not involve an act of embezzlement. A shortage in the accounts of an employee causing loss to an employer may result from mistake, disobedience of orders, or bad judgment, and not from any wrongful intent on the part of the employee. Thus, it has been held that an employee who becomes indebted to his employer through mistake or carelessness, or using funds of the employer for his personal use with no intent to defraud, is not guilty of embezzlement and therefore of a dishonest act within the meaning of a fidelity bond. Monongahela Coal Co. v. Fidelity D. Co., 5 Cir., 1899, 36 C.C.A. 444, 94 F. 732, writ of certiorari denied in 1899,175 U.S. 727, 20 S.Ct. 1023, 44 L.Ed. 339; United States Fidelity 
Guaranty Co. v. Bank of Batesville, 1908, 87 Ark. 348, 112 S.W. 957; United States Fidelity Guaranty Co. v. Overstreet, 1905, 84 S.W. 764, 27 Ky.Law Rep. 248; Williams v. United States Fidelity Guaranty Co., 1907, 105 Md. 490, 66 A. 495; Dixie Fire Ins. Co. v. Nelson, 1913, 128 Tenn. 70, 157 S.W. 416; Milwaukee Theater Co. v. Fidelity C. Co., 1896, 92 Wis. 412, 66 N.W. 360."
Our Brothers of the Second Circuit recently observed, in the case of Anders v. J.L. Evans Company, Inc., et al., 187 So. 109, 111, that: "* * * Fraud or dishonesty in the execution of contracts is never presumed. Where such character of acts is relied upon for success in an action for breach of contract, the facts pertinent thereto must be positively and unequivocally set out and supported by clear and convincing proof."
We will not attempt to reconcile certain conflicts between the testimony of the plaintiff and that of defendant and defendant's witnesses. Plaintiff readily admitted *Page 152 
that he had collected the two premiums from policyholders of the company. He likewise admitted that he retained or withheld these premiums, but, as he states, under the bona fide and justifiable belief that the defendant was indebted to him in a substantial amount and very probably in excess of the amount of the premiums retained. He further stated that defendant had continually refused to give him any accounting or statement as to the status of his account, and, being in need of money to meet his necessary living expenses, he was naturally prompted to retain these premiums.
We have no reason to doubt or question the verity of this statement. But, aside from that fact, the business relationship existing between plaintiff and defendant — whereby practically every week plaintiff received advances for which his account was debited and defendant, on the other hand, credited plaintiff's account with all commissions and renewals due plaintiff as they were collected — was of such a nature as to reasonably justify plaintiff's admitted conduct. Under such circumstances, it is not unreasonable to conclude that plaintiff, in collecting these two items and retaining them, had reason to believe that the amounts thereof would be debited to his account and charged off against all credits to which he was entitled, and that his conduct in so doing was without intent to defraud his employer within the legal meaning of the term "misappropriation".
Aside from the views that we entertain on the charge of misappropriation of funds of the defendant, the issues here presented can be readily disposed of by an application of the provisions of the contract existing between the parties and their actions and conduct in relation thereto.
Paragraph 15 of the contract (supra) provides, inter alia, that the "contract may be terminated * * * at the election of the party of the first * * * part" (defendant) if the plaintiff "shall fail to perform any of his agreements as herein expressed, * * *".
Paragraph 5 of the contract, headed "renewal rights", which we have quoted in full, provides that "in the event of the cancellation of this contract at the option of the parties of the first or third parts" (defendant and Union Central Life Insurance Company) defendant shall pay to the plaintiff "the balance of the renewal commissions above provided, less a collection fee of one per cent. of the renewal premiums * * *".
Paragraph 11 of the contract, under the heading "collections", which we have already quoted in full, provides that any misappropriation of funds "shall without further notice work an immediate termination of this contract and an unconditional forfeiture of all of the second party's interest and rights hereunder accrued or to accrue".
It is manifest from these three paragraphs that two distinct rights or remedies, with their correlative penalties, are provided for. In the first instance, should the defendant, the party of the first part, elect to terminate the contractual relationship with plaintiff by reason of the failure of plaintiff to perform any of his agreements, which necessarily included the collection of premiums from policyholders and the payment thereof to defendant, the cancellation of the contract, through the medium of election or option, would, under paragraph 5, require the defendant to pay to plaintiff the balance of renewal commissions accrued or to accrue, less the penalty provided for collection. On the other hand, in the second instance, under the quoted provisions of paragraph 11, any misappropriation of funds, which must be conceded a failure on the part of plaintiff to perform his agreement, would immediately terminate the contract but work an unconditional forfeiture of all of plaintiff's rights and interest accrued or to accrue.
It cannot be seriously disputed that there is nothing in our law which prohibits one from renouncing or waiving one or more of several rights afforded him, or of exercising one of several options established in his favor. The contract here presented was the law of the parties. In Conques v. Andrus et al., 162 La. 73, 77, 110 So. 93, 94, the wide liberty of contract which parties possess is recognized in the following language: "Parties are at liberty to make any kind of contract they see fit to make, and which is not contrary to law, public policy, or good morals."
Article 11 of our Civil Code reads as follows:
"Individuals can not by their conventions, derogate from the force of laws made for the preservation of public order or good morals.
"But in all cases in which it is not expressly or impliedly prohibited, they can renounce *Page 153 
what the law has established in their favor, when the renunciation does not affect the rights of others, and is not contrary to the public good."
Keeping in mind the contractual provisions quoted supra and the principles of law above announced, it is manifest that the defendant, seeking to put at an end all contractual relations with plaintiff because of the alleged misappropriation, could have done either of two things: (1) Voluntarily dismiss plaintiff, causing the forfeiture of all of his rights accrued or to accrue, or (2) terminate their contractual relationship and thereafter continue the payments of the balance of the renewals commissions accrued or to accrue, less the collection penalty on premiums to accrue.
The record discloses that immediately following plaintiff and defendant's brief conversation over the collection and retention of the stated premiums, defendant addressed a letter to plaintiff, dated the same day, May 23, 1923, advising of the termination of the contract, which letter we have heretofore quoted in full.
Referring to its contents, it must be observed that, in severing the contractual relationship, defendant has specifically used the word "terminated", as is used in Paragraph 15 of the contract. No word, suggestion, or intimation can be found in this letter indicating that the contract was being terminated for the reason of misappropriation of funds and much less that plaintiff's renewal commissions accrued and to accrue were to be henceforth considered forfeited. It is not unreasonable to conclude that, by the very language used, defendant was terminating plaintiff's agency under the "termination" clause of the contract, necessarily involving the correlative right of plaintiff to be paid his "renewals", accrued or to accrue, less the collection penalty on future accruals.
It is contended, however, that having thus notified plaintiff of the severance of their contractual relations, defendantintended to invoke the automatic renewal forfeiture clause of the contract. To determine whether defendant actually intended to forfeit plaintiff's right to the renewals, we shall direct our attention to analyzing the events which followed the termination of the contract.
The record discloses that on the date of its termination plaintiff was indebted to defendant in the amount of $727.62. The record shows that neither on that date, nor subsequently, did defendant attempt to assert such a claim. The record further shows that defendant, from and after May 23, 1933, continued to credit plaintiff on his books and records with each renewal commission as it became due to plaintiff under the contract, less the collection fee provided for. The record further discloses that defendant received all renewals growing out of the "old account No. 1" until he had received full payment of plaintiff's indebtedness to him. Thereafter defendant made monthly remittances out of plaintiff's renewals for plaintiff's account under the assignment to the Iberville Trust Savings Bank, less 1 per cent. collection fee, until, at the time of the trial below, the bank had been paid in principal and all save a small amount due for interest.
The record further discloses that all of the first year's commissions due to plaintiff were credited to him in full on defendant's books after May 23, 1933, as had been done prior to that date. It is also shown that, from the termination of the contract on May 23, 1933, up to December 31, 1934, plaintiff was credited on defendant's books with his renewal commissions, less the collection penalty. We strikingly note that on December 31, 1934, plaintiff's renewals, as credited on the books of defendant, had not only liquidated his indebtedness to defendant, but there remained a credit on the books in plaintiff's favor in the amount of $83.64, which it is shown, on January 9, 1935, by journal entry, defendant credited to his "profit and loss account".
This conduct and dealing must carry the unquestioned conviction that defendant did not entertain the remotest idea of any intention to enforce the renewal forfeiture clause. It is obvious that the idea of invoking the forfeiture clause was only conceived on December 31, 1934, more than nineteen months after the termination of plaintiff's contractual relationship. In explanation of his belated action to invoke the forfeiture on the date mentioned, we find defendant testifying as follows:
"Q. Now, after Mr. Borie's relationship with you terminated on May 23, 1933, why did you go on crediting his commissions and renewals to his account on your books?
* * * * * *
"A. I didn't think the man would ever pay out. I didn't think much about it one way or the other. I had no hard feelings *Page 154 
towards Borie — none whatever — nothing but the kindest — but his actions towards my company and policyholders became very ugly, and twisting of business — some of the business that he claims renewals on, and things of that kind — and I determined to do otherwise and take advantage of my contract rights."
Undoubtedly, defendant was mistaken as to his motive and determination to "take advantage of" his "contract rights", for, on March 31, 1936, defendant wrote a policyholder, Frank C. Winter, as follows:
"Dear Sir:
"With further reference to your note in amount of $211.27, with interest to date of $37.49, past due since August 22, 1933, which I accepted for cash personally advanced in connection with your policies above numbered, I advise that Mr. Bernard S. Borie, through whom your policies were issued, was responsible for this note and inasmuch as it was not paid at maturity it was charged to him.
"Although Mr. Borie is no longer connected with this company, when your note with accrued interest is paid he will be entitled to these funds. He has, therefore, asked that I advise you he has to raise approximately $200.00 by the end of this week in order to prevent foreclosure of his home, and hasn't the faintest idea as to how he can raise this money within the time mentioned, unless your note is paid.
"Mr. Borie has asked that I advise you he would be willing to waive the interest of $37.49 on your note above mentioned if you will let us have a remittance for $211.27 in payment of this note so as to reach here by Saturday, April 4th. Inasmuch as this will result in a considerable savings to you and will assist Mr. Borie tremendously, I trust you will let us have your remittance by return mail."
The contents of this letter unmistakably show that, as late as March 31, 1936, almost three years after the termination of plaintiff's contract, defendant recognized his obligation and indebtedness to plaintiff for commissions and renewals, as provided for by the contract, and, in fact, paid and credited them to plaintiff's account. A fortiori, had these rights been forfeited as of date May 23, 1933, plaintiff would not be entitled to these funds.
It is well recognized in our law that, once a party to a contract has elected a remedy, or right, or option, on which he will rely under his contract, he cannot thereafter shift to another remedy, right, or option which subsequent circumstances or events might make it more advantageous for him to adopt. Had defendant intended or desired to invoke the renewal forfeiture clause of the contract, thereby depriving plaintiff of the benefit of any renewals, accrued or to accrue, he would unequivocally and unmistakably have done so. In the case before us, under the facts as presented, he chose to and did exercise his rights under the contract by terminating plaintiff's agency and thereafter continuing to credit on his books and make payments thereunder of all commissions and renewals as they accrued, retaining for himself the 1 per cent. penalty for collection thereof. Having chosen and exercised this right and remedy, he must be held to have renounced and waived all other remedies or rights afforded by the contract and cannot now be heard to seek a revival of that right. Des Allemands Lumber Company v. Morgan City Timber Company, 117 La. 1, 41 So. 332; Bierce v. Hutchins, 205 U.S. 340, 27 S.Ct. 524, 51 L.Ed. 828; Sanitary Plumbing Company v. Carnahan, 6 La.App. 547; Columbia Weighing Machine Company v. Balter, 9 La.App. 326, 120 So. 397; Tremont Lumber Company v. Robinson Lumber Company, 160 La. 254,107 So. 101.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
JANVIER, J., takes no part. *Page 155