## G. HARLAN WILLIAMS, Receiver, *vs.* THE UNITED STATES FIDELITY AND GUARANTY COMPANY.

*Bond Conditioned for Honesty of Employee—Stipulation Making Surety Liable only for Larceny or Embezzlement— When Surety not Liable for Failure of Employee to Pay Balance Due—Objections that Bill of Exceptions was Signed After Expiration of Term Made too Late.*

When a bond conditioned for the honest performance of his duties by an employee provides that it shall cover only such dishonest acts of the employee as amount to larceny or embezzlement, there can be no re-

covery in an action on the bond for any acts or conduct of the employee which fall short of larceny or embezzlement.

In an action on such bond proof that there was a balance due from the employee to the employer and that the former failed to pay the same when demanded, is not alone sufficient to render the surety liable.

Under the agreement and course of dealing between the plaintiff, a fire insurance company, suing by its receiver, and its agent in another State, the latter was entitled to a credit of three months on his monthly balances due the company; the ascertainment of a monthly balance did not prove that the agent had actually received the amount thereof but made him liable to pay that sum at the end of three months subject to the contingency of its being reduced by his return to policy holders of unearned premiums, and the grant by the company of three months credit established the relation of debtor and creditor between the company and the agent authorizing him to apply to his own use during that time the money collected. The company did not require the agent to deposit the money he collected to its credit and draw upon it for the company's use. At the end of a three month's period the agent claimed that he was entitled to compensation for special services and that he should be credited with a large number of unearned premiums recovered, and he failed to pay the amount of the balance *prima facie* due by him. In an action on the agent's bond of indemnity, which provided that the surety should not be liable except for such dishonest acts of the agent as amount to larceny or embezzlement, *held*, that the evidence in the case does not show that the agent appropriated the money of the company with frandulent intent; that his failure to pay to the company the amount due by him without proof of his appropriation of the money with fraudulent intent does not constitute larceny or embezzlement, and that consequently the plaintiff is not entitled to recover against the surety.

When an appellee suggests changes in the bills of exception and participates in the discussion of them before the trial Judge at the time they were signed, it is too late for him to object for the first time in this Court on appeal, that the bills were signed after the expiration of the term at which the case was tried.

*Decided April 3rd, 1907.*

Appeal from the Circuit Court for Baltimore County (DUNCAN, J.)

The cause was argued before BRISCOE, BOYD, PEARCE, SCHMUCKER, BURKE and ROGERS, JJ.

*Charles W. Heuisler* and *E. Allan Sauerwein* (with whom
was *Elmer J. Cook* on the brief ), for the appellant.

*D. G. McIntosh* and *J. Kemp Bartlett* (with whom were
*Wm. J. O'Brien, Jr.,* and *Wm. H. Perkins, Jr.,* on the brief )ʼ
for the appellee.

SCHMUCKER, J., delivered the opinion of the Court.

The appellant, G. Harlan Williams, in his capacity of re-
ceiver of the Home Fire Insurance Company of Baltimore
sued the appellee in debt on its bond of indemnity given to
that company.    The suit was instituted in the Superior Court
of Baltimore City and was removed on affidavit of the plaintiff
to the Circuit Court for Baltimore county where it was tried.
At the trial in the Court below, the learned Judge granted a
prayer offered by the defendant at the close of the testimony
for the plaintiff instructing the jury to find for the defendant
because the plaintiff had offered no evidence legally sufficient
under the pleadings to entitle him to recover.    A verdict was
rendered in accordance with this instruction and judgment was
entered thereon for the defendant and the plaintiff appealed.

There are fifteen bills of exception in the record of which
the first fourteen relate to rulings on evidence and the fifteenth
to the Courts action on the prayer offered at the close of the
plaintiff's case.    As the prayer if properly granted finally dis-
poses of the controversy and a consideration of the propriety
of the Courts action thereon involves a review of the entire
case we will give that our first attention.

The bond declared on by the appellant, as plaintiff below,
was an employer's guaranty bond, originally issued to cover
the period of one year from August 1st, 1902, and extended
by agreement executed at Baltimore on July 1st, 1903, to cover
the ensuing year.    By its terms the appellee undertook to reim-
burse and make good to the Insurance Company, the em-
ployer, to the extent of $10,000 all loss sustained by it of
moneys, &c., "in the possession or custody of the employee
(Tuttle) or for the possession or custody of which he is re-

sponsible, *directly occasioned by larceny or embezzlement* on the part of the employee in connection with the duties of his office or position." A subsequent clause of the bond provided that the obligor should not be responsible for loss occasioned by any mere error of judgment or *bona fide* mistake, adding, "This bond being intended only to cover such dishonest acts of the employee in connection with the position in the service of the employer hereinbefore referred to *as amount to larceny or embezzlement.*" A further clause provided that the obligor should not be liable under the bond for the amount of any balance that may be found due the employer from the employee and again asserted that it was the *true intent and meaning* of the bond that the obligor should be responsible there under only for moneys, &c., "diverted from the employer through *larceny or embezzlement* on the part of the employee within the period specified in the bond."

The breach alleged in the declaration is that, within the period prescribed in the bond, Tuttle had as agent of the Insurance Company collected various sums of money on its behalf, of which he had stolen or embezzled the sum of $7,680.

A statement or account verified by the oath of the plaintiff was filed, with the declaration, charging Tuttle with his monthly balances from October, 1903, and crediting him with his commissions and sundry expenditures and debiting him, at its foot, "To net balance due Home Fire Ins. Co. $7680.69."

The reiterated declarations in the bond restricting the liability of the surety to losses occasioned by the larceny or embezzlement of the employee or by such dishonest acts as amount to larceny or embezzlement are too distinct and positive to be ignored or explained away. The bond should receive at our hands a reasonable construction so as to give effect to the intention of the parties thereto and carry out the purpose for which it was executed (*Union Ins. Co.* v. *U. S. Fidelity Co.*, 99 Md. 423) but the plain language used by those parties in defining the limit of the liability of the obligor requires us to hold that there can be no recovery in this case for any acts or conduct of the employee which fall short of

larceny or embezzlement.   It therefore becomes important for us to determine what are the essential elements of those two offenses.   Larceny, at common law, was the felonious taking the property of another against his will with the intent to convert it to the use of the taker or, as some authorities hold, the use of the taker or a third person.   Embezzlement, which is a statutory offense, consists in the fraudulent appropriation to one's own use of money or goods entrusted to him by another. In larceny the felonious intent must have existed at the time of the taking of the property whereas in embezzlement the fraudulent act consists in the appropriation of the property to the use of the taker or third party, but the felonious or fraudulent intent is of the essence of the offense in each case. *Bouvier's Law Dict.* under "Larceny" and "Embezzlement;" *Wharton's Crim. Law,* sec. 883 &c. and 1009 &c; 15 *Cyc.* 488; *A. & E. Encycl.,* vol x, p. 979 *et seq.* vol. 18, p. 459.

It was not seriously contended in this case that the acts of Tuttle in failing to pay over to the Insurance Co. an alleged balance of its funds in his hands amounted to larceny at common law as the funds were paid to him by the company's consent.   It was however contended that as his office was at Syracuse in New York the alleged offense must be regarded as committed in that State, and that it amounted to larceny as defined by the New York statute.   A copy of that statute was put in evidence in the case and appears in the record.   By it larceny, embezzlement, obtaining property under false pretences and felonious breach of trust are included under one definition.   It provides that a person who "with the intent to deprive or defraud the true owner of his property or the use thereof or to appropriate the same to the use of the taker or any other person," either takes from the possession of the owner or other person, or fraudulently obtains possession of, or secretes, withholds or appropriates to his own use or that of any person other than the owner any money or property, or, having it in his possession as agent or trustee, &c., appropriates the same to his own use or that of any person other than the owner or person entitled to the benefit thereof, steals such

property and is guilty of larceny.   A section of the Insurance Law of New York was also offered in evidence, which provides that the agent of any Insurance Company who as such collects or receives any money shall be responsible in a fiduciary or trust capacity to the company therefor.

This statutory modification of the definition of larceny, including embezzlement, as interpreted by the Courts of New York has not done away with the necessity of proving the *felonious or fraudulent* intent at the time of taking, or appropriating or withholding the property in order to establish the offense.   *People* v *Pollock*, 51 Hun. 613;   *People* v. *Lawrence*, 137 N. Y. 547; *People* v. *Henderson*, 90 N. Y. 12; *People* v. *Loomis*, 67 N. Y. 329; *People* v. *Grim*, 3 N. Y. 317.

In a number of suits brought on bonds which, like the one now before us, by their terms limited the liability of the surety to losses by larceny or embezzlement or by dishonest acts amounting to those offenses, it has been held that proof of a balance due from the employee to the employer and a failure to pay the same when demanded was not sufficient to bind the surety.   There must be proof of dishonest acts of the employee within the contemplation of the bond.   Fraud and dishonesty are not presumed, they must be proven.   *Monongehela Coal Co.* v. *Fidelity & Deposit Co.*, 94 F. R. 736; *Guarantee Co.* v. *Mech. Savings Bank*, 100 F. R. 550; *Clifton* v. *Fidelity, &c., Co.*, 66 N. W. Rep. 361; *Reed* v. *Fidelity, &c., Co.*, 42 At. Rep. 294.

Let us now consider in the light of these principles the facts of the present case.   It appears from the evidence, all of which was for the plaintiff, that late in March or early in April, 1900, an agreement was entered into between the Home Fire Insurance Company of Baltimore, acting by its president, G. Harlan Williams, and his son, Howard T. Williams, who was its secretary, and Robert R. Tuttle, by which Tuttle became the general agent of the company for Pennsylvania and New York with his headquarters at Syracuse, New York.   There *is no evidence* of a formal written contract between the parties.   G. Harlan Williams testified, in reply to the question whether the company had a verbal or written contract with

Tuttle, that he thought "the commencement was verbal." "It may have been in correspondence." "I have not a clear recollection of it." "I cannot say whether it was by specific contract or just a verbal understanding." The following letter purporting to have been addressed by him on April 4th, 1900, to Tuttle was shown to him and he was asked if the signature to it was his. "We are in receipt of your favor dated 2nd inst., in which you ask us to write a letter embodying the arrangement made between the company and yourself as its general agent. As we understand it, you are to give us careful, judicious services, covering that part of New York outside of what is known as the Metropolitan and Suburban Districts, in consideration whereof we are to allow you 30 per cent commission, and in addition 10 per cent contingent commission upon profits of the company in the territory above referred to. By profits is meant the actual remittances from you to the home office less losses sustained by the company in your jurisdiction. We believe this covers the agreement between us," (signed G. Harlan Williams, Prest.) Mr. Williams admitted his signature to the letter to be genuine but he said at the same time "that letter never meant a written contract," but simply referred to the agreements that arose out of the conversations between the parties. He further said that the company "allowed Tuttle to settle small losses in his territory, up to $100, and upon approval to deduct the amount from net remittances, to pay agents licenses of ten dollars and charge in his account, also to pay fire department taxes; cancellations would come through Tuttle and he would charge the company with the amount paid by him to policy holders and deduct that amount from next balance; the company never dealt directly with its policy holders but always with its agents; that the company required Tuttle to pay unearned premiums to policy holders and permitted him to charge the same to the company;" that Tuttle was to settle monthly and at first did so but not latterly; that in twenty-six instances concerning which letters were shown the witness Tuttle had settled his monthly balances "upon a credit" of from two months and twenty-nine days to four months and four days.

Howard T. Williams, who had been secretary of the company for the eleven years preceding the appointment of the receiver and who assisted the receiver in the discharge of his duties, testified, when asked to state the substance of the negotiation leading up to making Tuttle the New York agent of the company, said "The substance of that negotiation which covered over several meetings was to the effect that he was to be our general agent for the State of New York for the procurement of business; he was to select his agents for the procurement of his business, he was to inspect that business paying the travelling expenses and salaries of his agents. We were to pay him 30 per cent commission and to pay all agents licenses, fire department taxes, the State fees for entrance, all adjustment expenses and the losses and if any profit showed over and above that he was to have 10 per cent contingent; he was to be responsible for all agent's balances, use due diligence in the collection thereof and to remit us in 90 days the account current." This witness further said that in making up such accounts current Tuttle would take the total amount of premiums written by all his different agents and then he would deduct from that amount his commissions, any rebates or cancellations he would have, any little bills he may have paid for small fire losses or fire department taxes or things of that kind, and strike a balance which the company would then carry on its books as the amount due it for that month's business, which it would charge him with and when he remitted that would be the amount of his remittance. On cross-examination this witness reiterated the asssertion that under the arrangement with Tuttle the latter was entitled to retain in his possession his monthly balances for three months before remitting, and stated that G. Harlan Williams, the witness' father, had been mistaken in testifying that it was Tuttle's duty to remit his monthly balances on the first of the ensuing month.

It is apparent from the whole testimony for the plaintiff that in the course of dealing between Tuttle and the company he was currently permitted to retain his monthly balances for

three months and sometimes longer before remitting them to the company. There is no evidence he was required or expected to deposit to the credit of the company or keep separate from his own moneys the premiums received on policies issued by it through him. On the contrary the evidence shows that he remitted his own checks for the balances due him, and that the officers of the company believed that he kept in bank to his own credit the balances due the company and made no objection or protest to his doing so.

Tuttle continued to conduct the company's business to its satisfaction in the territory covered by his contract until the losses incurred by the great fire in Baltimore City on February 7th—8th 1904, compelled the company to cease operations and go into the hands of the appellant as receiver. At that time Tuttle had settled with the company up to the previous October 1st and had rendered to it his current accounts for the four months up to the current month of February. These current monthly accounts charged. Tuttle with the premiums for all business done through his office during the month, whether he had collected them or not, and gave him such credits as he was entitled to for the month. The accounts were only tentative and not final because if Tuttle were afterwards compelled by cancellation of policies or other good reasons to return to the policy holders any portion of the premiums with which he was thus charged he would be credited with the amount so returned, on the account for the month in which the return was made. For instance Howard T. Williams, having testified that on January 14th prior to the fire the monthly accounts theretofore rendered, showed a total balance against Tuttle of about $15,000 was asked whether he had not failed to take into account the possibility that subsequent cancellations of policies might not have wiped out that $15,000. He replied "I overlooked the fact that the cancellations could have wiped out the three months business, that is the reason he was given three months credit." He was then asked "Now the cancellations might have gone even further than that might they not?" To which he replied "Might have brought us in debt to him."

Upon the happening of the fire the company on February 10th, 1904, telegraphed to Tuttle that it declined to assume any further liability or renew any expiring risks and that he should govern himself accordingly. Later in the same day it wired him that it would "most likely reinsure in Hartford." On the 13th it wrote him a letter saying in effect that every thing was in confusion, that they were trying to straighten matters out, that they were not broke and were trying to get the best terms for reinsurance. On the 23rd the company wired to Tuttle "Home cannot protect policy holders." During the days immediately following the fire the company re·ceived from Tuttle a number of unpaid telegrams. The banks being closed and the company's funds locked up in the fire ruins its officers refused to pay for the telegrams and therefore their contents are unknown but the fact that they were sent shows an effort on the part of Tuttle to communicate promptly with the company.

As soon as the receiver got well into the saddle he began to send requests to Tuttle to remit the balance in his hands to the credit of the company but got no reply from him until March 26th. when he wrote to the receiver as follows: "Replying to your letter asking for a remittance beg to advise that it has been utterly impossible for us to make any collections since the Baltimore Fire. In fact every agent has a claim against the Home for more than the amount of their balances and my claim against the Home will be an exceedingly large one, just the amount I will advise you as soon as I can get in the cancelled policies and make an account."

Early in May, 1904, the receiver sent Mr. Thos. E. Bond, an experienced accountant and insurance adjuster, to Syracuse to procure from Tuttle a statement of his accounts with the company. On May 9th Mr. Bond reached Syracuse and went to Tuttle's office to see him about the matter. Tuttle assigned as the reason for not having already sent the accounts that he had been very busy and that there was a large volume of claims for return premiums some of which were still coming in, and he insisted that when they had all come in

the balances of the account would be in his favor.    He with-
out any objection, at Mr. Bond's request not only gave him
access to his books of account but permitted him to take such
of them as he desired over night to the hotel at which he was
stopping.  . Tuttle also referred him to the bookkeeper of the
agency end she gave him such assistance as he asked for.
Mr. Bond found that the ledger and others of the books had
not been brought down to date, but he made up a statement
of the account, as well as he could according to which Tuttle
was largely in debt to the company.    He went with it to the
office of Tuttle and showed it to him.    Tuttle expressed great
surprise and said Bond had evidently not gotten all of the return
premiums, that they could not have been put on the books
and promised to meet Bond that afternoon and take the matter
up with him and give his whole time to it.    When Bond went
to Tuttle's office in the afternoon he was informed that the
latter had been unexpectedly called to New York City and
would be gone for some days.    Mr. Bond then returned to
Baltimore.

In the latter part of May or sometime in June Tuttle sent
to the receiver a statement showing a balance against himself
of $3,561.19. This was followed at a later day by another
statement, claiming an additional credit of $3,810, for alleged
special services and expenses of himself and two special agents
and a clerk during the two weeks following the Baltimore fire
in visiting sub-agents in his territory and otherwise attempt-
ing to hold the business together until the company could ar-
range to reinsure its risks.                              .

The defendant filed a bill of particulars in the shape of an
account with its eighth plea, which by way of equitable defense
alleged that upon a proper accounting the balance of accounts
between the company and Tuttle was in his favor.    This bill
of particulars charged Tuttle with the same monthly balances,
within a few dollars as those charged against him in the ac-
count filed with the declaration but it claimed credits in his
favor mainly for return premiums, unpaid agents balances, and
the special services and expenses already mentioned, amount-

ing in the aggregate to more than the total debits and showing a balance in his favor.

The evidence for the plaintiff, of which we have stated the substance, was not in our opinion legally sufficient to prove dishonest acts on the part of Tuttle amounting to larceny or embezzlement.   It is clear that under both the agreement and course of dealing between him and the company he was entitled to "a credit" of three months on his monthly balances.   The ascertainment of the monthly balance under their course of dealing did not prove that the amount of the balance had actually come to his hands.   It merely made him liable under the contract to pay that sum, at the end of three months thereafter, subject however to the contingency of its being wiped out in whole or in part by the subsequent return by him to policy holders of unearned premiums.   The company by the grant to him of this three month's credit established the relation of debtor and creditor between it and him and authorized him to apply to his own use during that time so much of the balance charged against him as came to his hands and relied upon his obligation under their contract to repay to it a like amount at the end of the period for which the credit was given.   *Milwaukee Theatre Co.* v. *Fidelity Co.*, 66 N. W. R. 361; *McElroy* v. *People*, 202 Ills. 473.   If at the end of the three months he was unable to pay or simply failed to pay what was due that fact without proof of some fraudulent disposition of the money *animo furandi* would not have sufficed to convict him of larceny or embezzlement of it.   If the company had required him to deposit the money to its credit and draw upon it as its agent and for its use and thus entrusted him with the mere custody or possession of it and he had applied it to his own use the case would have been different. The mere failure to pay a debt without compulsion even by one having the financial ability to pay it is neither larceny nor embezzlement.

Tuttle neither concealed nor denied the amount of the "balances" *prima facie* due by him, he admitted them and freely gave the company's accountant access to and temporary pos-

session of his books of account for examination but asserted
that his claims against the company exceeded his debits. Nor
are the claims made by him, whether excessive in fact or not, of
such nature that their assertion affords *prima facie* evidence of
fraud on his part. Such of the claims as are for return premiums,
and they constitute the greater part of them, do not suggest
fraud for they were contemplated and provided for by the
agreement between the parties, and the failure of the company
after the fire made it practically certain that the amount of
those claims would be unprecedently large in the aggregate.
The claims made by Tuttle for special services and expenses
incurred in an alleged effort to hold the business together
after the fire are unusual in their nature but the unusual se-
verity of the Baltimore fire and the uncertainty for a time as
to its effect upon the continued existence of the company pre-
sent a situation under which the assertion of claims of that
character does not raise a *prima facie* presumption of dishon-
esty amounting to larceny or embezzlement. Tuttle was un-
doubtedly dilatory and perhaps indifferent in sending in his
accounts after the fire, and the failure on his part to keep his
engagement with Mr. Bond at Syracuse was discreditable to
him, but, in view of the fact that he then asserted and still as-
serts the right to credits for returned premiums and expenses
in excess of the balance against him, those circumstances if
they had been found by the jury would not have been legally
sufficient, to warrant the finding of a verdict for the plaintiff
under the bond sued on in this case. The learned Judge below,
in our opinion, committed no error in granting the defendant's
prayer.

We will not add to this opinion, already long enough, a
discussion in detail of the rulings on evidence brought up by
the other exceptions. It is sufficient to say that we find no
reversible error in them. The evidence referred to in the first
and second exceptions, which was excluded because it tended
to vary the terms of the letter of April 4th, 1900, from G.
Harlan Williams to Tuttle, which the Court below treated as
the written contract between him and the Insurance Co., should

have been admitted as Mr. Williams himself testified that the letter was not intended to constitute a contract and the other evidence corroborated him in that respect. We do not however regard the Court's action on those exceptions as presenting reversible error as we have treated that evidence as properly in the case and have considered it in arriving at the conclusions to which we have given expression in our opinion.

The motion made by the appellee to dismiss the appeal because the order extending the time for signing the bill of exceptions was not passed until after the expiration of the term cannot prevail. It appears from the affidavits of the counsel for the appellant and the certificate of the trial Judge that the counsel for the appellee when the bills of exception were presented to them after the expiration of the term examined them and made sundry changes in them and were present in Court when they were signed and participated with appellant's counsel in discussing them before the Judge who allowed further changes to be made in them at the request of the appellee's counsel, and that no protest or objection was then made on behalf of the appellee to the signing of the bills. Under these circumstances it is too late for the appellee to raise for the first time in this Court the objection that the exceptions were signed too late. *Thomas* v. *Ford*, 63 Md. 346; *Edelhoff* v. *Horner-Miller Mfg. Co.*, 86 Md. 605.

The judgment appealed from must be affirmed.

*Judgment affirmed with costs.*