[Civil No. 3243. Filed January 23, 1933.]

[18 Pac. (2d) 260.]

CHICAGO FIRE AND MARINE INSURANCE COMPANY, a Corporation, Appellant, v. FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Corporation, Appellee.

Messrs. White & Wilson, for Appellant.

Messrs. Silverthorne & Van Spanckeren, for Appellee.

LOCKWOOD, J.—This is an action by Chicago Fire and Marine Insurance Company, a corporation, hereinafter called plaintiff, against Fidelity and Deposit Company of Maryland, a corporation, hereinafter called defendant, to recover on a certain indemnity bond issued by defendant in favor of plaintiff and claimed by the latter to guarantee it against loss occasioned plaintiff by reason of the larceny or embezzlement of one Charles E. MacMillin.

The case was heard before the court without a jury,

and at the close of plaintiff's evidence defendant moved for judgment, which motion was granted, and judgment was rendered accordingly. After the usual motion for new trial was overruled, this appeal was taken.

There are some four formal assignments of error, but together they raise but one question, and that is whether the evidence for plaintiff was sufficient to sustain a recovery on the bond. The facts developed by the evidence are as follows: Plaintiff is a corporation engaged nationally in the fire and marine insurance business. On February 14th, 1928, it appointed MacMillin Agency, Inc., of Phoenix, Arizona, its general agent and manager for the state of Arizona. In reality the MacMillin Agency, Inc., was Charles E. MacMillin in his individual capacity, that being the name under which he conducted his business. Thereafter defendant executed in favor of plaintiff an indemnity bond, the vital clause of which reads as follows:

" . . . That the Fidelity and Deposit Company of Maryland, (hereinafter called Surety) does hereby agree to pay unto Chicago Fire and Marine Insurance Company, (hereinafter called Employer), within ninety days after proof of loss as herein set forth, the amount of any direct loss, which any Employee listed in the schedule hereto attached or added thereto as hereinafter provided, may, while in any position and at any location in the service of the Employer, directly or by collusion with others, cause to the Employer, not exceeding, however, the amount hereinafter set forth, through any act of *larceny or embezzlement committed.* . . . " (Italics ours.)

It is not disputed that the MacMillin Agency, which, as we have said, was the *alter ego* of Charles E. MacMillin, was included in the schedule referred to by the bond. The agency agreement is lengthy, and we shall merely summarize the features necessary

for us to consider in determining this case. By its terms MacMillin had all the power of general agent and manager for the plaintiff in Arizona. He could appoint all local agents in the state, which agents reported directly to him and not to plaintiff. He was required to give a monthly report of all insurance business written by him or the local agents in the state of Arizona and to forward to the plaintiff the balance shown by such statements within ninety days after the close of the month for which the account was made up. The contract further contained this clause:

" . . . The Manager hereby agrees to carry out faithfully all instructions given or to be given and will be responsible to the company for all transactions and all balances due by his office and by agents appointed by him. . . . "

In other words, MacMillin assumed the responsibility of paying plaintiff the premiums for all business done by him or his local agents in the state of Arizona, regardless of whether they were collected or not.

MacMillin continued as such general agent for a period of approximately two years, and up to July, 1929, at least faithfully accounted to plaintiff under the terms of his contract. During all this period the premiums collected by MacMillin were deposited in Phoenix, Arizona, to the credit of the MacMillin Agency, and commingled with the funds received by him through other insurance companies which he represented, and all checks on said account were signed "The MacMillin Agency, Inc., By Charles E. MacMillin"; payments to plaintiff of the amounts due it being made by these checks. R. M. Nevins, the secretary of plaintiff, testified in substance that plaintiff neither knew nor cared how the money collected by MacMillin was handled, but knew he represented other

companies and assumed the funds were handled as above stated; that the contract with MacMillin Agency, Inc., provided that it was liable for the amount of the insurance written whether collected or not, and that so long as the balance shown by the monthly statements was paid within ninety days after the statement was rendered, plaintiff did not consider it any of its business as to how the money was handled, or whether the premiums had ever been collected or not.

The evidence further tended to show that MacMillin had written policies bearing premiums in the amount of some $10,000 or $15,000, on which there was a balance due plaintiff of at least $5,000, of which payment had been demanded and refused by MacMillin.

Under the penalty of the bond above set forth, defendant was liable to plaintiff for any larceny or embezzlement committed by MacMillin as its agent, but not for any acts of fraud or dishonesty not amounting to one of these felonies. There is, of course, no evidence of larceny on the above statement of facts. Was there any embezzlement? This court has held in *Territory* v. *Meyer,* 3 Ariz. 199, 24 Pac. 183, that to sustain a conviction of embezzlement three facts must be shown: First, the trust relation; second, the possession or control of property by virtue of the trust; and, third, the fraudulent appropriation of the property not in the due and lawful execution of the trust.

The first question which then arises is whether or not under the facts above stated the specific money received by MacMillin as premiums was the property of plaintiff which he held in trust for it as agent, or whether, as contended by defendant, under the terms of the contract and the course of business as actually conducted, the writing of policies by MacMillin

created between him and plaintiff the relation of debtor and creditor only, the particular money received in payment of the premium being the property of MacMillin. A question very similar to that involved herein came before the courts of Tennessee in the case of *Dixie Fire Ins. Co.* v. *Nelson,* 128 Tenn. 70, 157 S. W. 416, the material facts thereof being as nearly parallel to those of the instant case as is often found in two reported cases. The court gives two reasons for denying recovery on the bond. The first is that, since the contract made the general agent liable for the premiums, whether collected or not, the relationship created by such contract was simply that of debtor and creditor, and it cites in support thereof the case of *State of Washington* v. *Covert,* 14 Wash. 652, 45 Pac. 304. Apparently the chief reliance was placed, however, upon the manner in which the premiums collected by the general agent were handled, and the reasoning on this is so pertinent, and, in our opinion, so sound, that we quote it somewhat at length:

" . . . It is proper, of course, for an agent to deposit the money of his principal in a solvent bank, if the account shows that the money belongs to his principal. *State* v. *McFetridge,* 84 Wis. 473, 54 N. W. 1, 998, 20 L. R. A. 223. But if the agent deposits his employer's money in his own name, that is a conversion. *United States Fidelity & Guaranty Co.* v. *People's Bank* [127 Tenn. 720], 157 S. W. 414, Jackson, April term, 1913. If the principal knows that the agent is accustomed to making such conversion, and raises no objection to it, but accepts the agent's individual checks habitually for balances found due against the agent, he must be held as consenting to the conversion, and to the creating of the relation of debtor and creditor merely between himself and the agent, since the deposit in bank in the individual name of the agent creates the relation of debtor and creditor between the bank and the agent. The principal must be held to know that,

where he consents to deposits in such manner, he agrees that the relation so based on his money deposited by the agent creates such relation of debtor and creditor between the agent and the bank, and that an indebtedness must thereupon arise from the agent to him from such use of the money. Any other view would involve the proposition that the principal could consent that the title to his funds might be vested in the bank through a loan made by the agent in his individual name to the bank, at the same time that he would be in a situation to insist that the title still remained in himself—a manifest absurdity.

"Nor is this a view based merely upon technical reasoning. It goes to the heart of the controversy. We do not gainsay the proposition that, if it be made to appear that an agent has appropriated the money of his principal to his own use, nothing else being shown, a case of fraudulent conversion is made out, under which a charge of embezzlement can be sustained. But if the principal habitually permits his agent to convert his money, by depositing it in bank in his own name, and accepts the agent's individual checks in payment from time to time, as occasion for payment arises, he must thereby be held to understand that the money is subjected to the perils of the agent's individual business, and when it is lost in that business it is then too late for the principal to bring a charge of embezzlement. . . .

"We cannot doubt in the present case, from the full knowledge which the insurance companies had and the course of business referred to, the failure at any time to object to the method in which the deposits were made, and the invariable habit of receiving his private checks, that the companies assented to the way in which the agent dealt with the fund. Indeed, Mr. Bush, the vice president of the companies, when asked about this method of payment, said, in substance, that it made no difference to the companies how they got the money, so that it was paid. . . . "

The view taken by this case is supported in *Williams* v. *United States Fidelity Co.*, 105 Md. 490, 66 Atl. 495.

We have also passed upon the general principle involved, although the case did not happen to be one for recovery on a surety bond. In *Security Trust and Savings Bank* v. *Button,* 39 Ariz. 406, 7 Pac. (2d) 245, the question of whether the collection of money by one bank for the account of another created the relation of debtor and creditor or principal and agent came before us. Therein we held as follows:

" . . . An agreement that the proceeds of the checks, if charging the various depositors' accounts with these checks can be said to be a collection of them, may be mingled with those of the bank and used by it and that it may substitute for them its own obligation destroys any idea of a trust, or the relation of principal and agent, and brings into being in its stead that of debtor and creditor. Among the numerous authorities to this effect we mention the following: [Citing cases.] . . . "

We think that principle applicable in cases like the present. Plaintiff had tacitly agreed that the proceeds of the various insurance policies written by MacMillin might be mingled with his other funds and deposited to his own credit in a bank, and had specifically insisted that he not only might but must give his personal obligation to pay the total amount of premium written, regardless of how much was collected. Both on authority and on reason this destroyed any idea of the relation of principal and agent or a trust existing between MacMillin and plaintiff *in regard to the particular funds in question.* Such being the case, of course, there could be no embezzlement.

Plaintiff has called to our attention on this point the cases of *Monongahela Coal Co.* v. *Fidelity Co.,* (C. C. A.) 94 Fed. 732, and *National Surety Co.* v. *McCutcheon,* (Tex. Civ. App.) 270 S. W. 1062. In the first of these the bond provided that "the true intent and meaning [are]. . . . that the company

shall be responsible . . . for moneys, securities, or property diverted from the employer through fraud or dishonesty on the part of the employee. . . . "

And in the second case the liability of the company was held to "include . . . loss sustained by the obligees . . . by reason of fraud, or dishonesty of the principal in connection with the duties pertaining to the office or position of agent. . . . "

It is obvious that obligations of this kind create a far greater liability than the instant bond, for "fraud or dishonesty" is a much broader phrase than "larceny or embezzlement." The fraud and dishonesty may be committed by a debtor against a creditor, but embezzlement implies necessarily a closer relationship between the parties. Since under the evidence the relation of debtor and creditor, and not that of principal and agent or trustee and *cestui que trust,* existed in regard to the funds in question, the trial court correctly held that plaintiff's evidence shows affirmatively it was not entitled to recover. The judgment of the superior court of Maricopa county is affirmed.

ROSS, C. J., and McALISTER, J., concur.