JAMES MAC GRAY v. MACK F. BENNETT.

(Filed 23 September, 1959.)

**1. Master and Servant § 1—**

A driver and collector for a laundry on a commission basis who is personally charged with all work brought in by him without any record being kept by the laundry in regard to the individual accounts of the customers, the driver being personally liable for the entire account without regard to whether the customers pay and being personally responsible for the purchase and maintenance of his delivery truck, is a debtor to the laundry on such accounts and not an employee.

**2. Embezzlement § 1—**

Where the relationship between the parties is that of debtor and creditor and not that of employee and employer, the debtor cannot be guilty of embezzlement of any funds due on the account.

**3. Malicious Prosecution § 10—**

In this action for malicious prosecution the evidence disclosed that the relationship between the parties was that of debtor and creditor and not that of employee and employer, and that a prosecution for embezzlement was instigated by the creditor against the debtor in regard to the account. *Held*: Nonsuit was erroneous, and *held* further, even had the relationship been that of employee and employer, the evidence in this case disclosed want of probable cause.

HIGGINS, J., not sitting.

APPEAL by plaintiff from *Stevens, J.,* May Civil Term 1959 of CRAVEN.

This is a civil action to recover damages for malicious prosecution. The evidence pertinent to the appeal in substance is as follows:

1. The plaintiff, a young man 22 years of age, entered into an agreement in December 1951 with the defendant, Mack F. Bennett, trading as City Laundry and the Dixie Laundry and Dry Cleaners, Inc., of which the defendant was president and principal stockholder. Prior to the time he entered into the contract, the plaintiff was working for a competitor of the defendant in New Bern. Under the terms of the agreement the plaintiff was to collect and deliver, by truck, laundry and dry cleaning from a route within an area described in the contract. The plaintiff was to furnish his own truck and to maintain it, including public liability insurance thereon.

2. The sole compensation to the plaintiff was to consist of a commission of 25 per cent of all sums collected for the processing of laundry and 40 per cent of all sums collected for the processing of dry cleaning. The agreement required the plaintiff to make an accounting of all sums collected by him, less the commissions set out above, on the 5th and 21st days of each month. According to the plaintiff's evidence, the requirement to settle on any particular date was thereafter waived. The evidence further tends to show that the defendant never furnished the plaintiff a route and never suggested or gave to him the names of any customers in the prescribed area except the Hostess House at Cherry Point. He had to establish his own route, which he did by soliciting the customers he had served previously.

3. In delivering laundry to the defendant and dry cleaning to the Dixie Laundry and Dry Cleaners, Inc. (hereinafter called Dixie), defendant and Dixie never looked to the individual customer for the charges for processing the laundry and dry cleaning, but required the plaintiff to pay 75 per cent of the retail price for laundry and 60 per cent of the retail price for dry cleaning. There was no individual accounting for each customer between the plaintiff and the defendant or the defendant's corporation. The plaintiff collected from his customers and the defendant and Dixie looked to him for their money.

If the plaintiff extended credit to a customer and for any reason the customer did not pay, then the loss fell on the plaintiff and not on the defendant or Dixie.

Neither the defendant nor Dixie ever withheld any income tax or issued the plaintiff any paycheck or receipt for the monies paid by the plaintiff to them.

4. At the time the plaintiff went to work for the defendant, defendant lent the plaintiff money to make a down payment on a truck to be used in picking up laundry and dry cleaning and took a chattel mortgage on the truck, and the plaintiff paid the defendant the sum of $30.00 a month on this account.

5. In March 1952, the defendant suggested that the plaintiff borrow $250.00 from the bank to take care of a loss of $150.00 suffered by the plaintiff on his laundry business due to one of the plaintiff's subcontractors who picked up cleaning for him. This amount overpaid the plaintiff's account with the defendant but the balance was held as an advance on the laundry account. The defendant signed or endorsed the plaintiff's note at the bank and received the money. The plaintiff made monthly payments to the defendant thereafter in the sum of $25.00 to be applied on this note. When the $250.00 note was executed, the defendant, in exchange for signing or endorsing the plaintiff's note, required the plaintiff to give him two signed checks for $125.00 each.

6. On 15 March 1952, the defendant insisted that the plaintiff sign an application for an indemnity bond. The defendant paid the premium for this bond. Thereafter, the laundry solicited by the plaintiff decreased to such an extent due to poor services received from the defendant, that the defendant suggested that plaintiff carry his work to another laundry and to make his own arrangements until he could do the work. The defendant informed him that he had called the Spotless Laundry and suggested that the same arrangement be carried out between him and that laundry that he had had theretofore with the defendant. The plaintiff made such an arrangement with the other laundry.

7. Thereafter, the plaintiff resumed business with defendant. Payments were made to the defendant on the laundry account by the plaintiff, but the defendant applied them on the loan and truck account of the plaintiff, even at times when no payments on such loans were due. The defendant kept all the records, mostly in pencil, and refused to give plaintiff receipts for sums paid.

8. In April 1952, the defendant had the plaintiff give him a $1,000 note secured by a chattel mortgage on his truck to cover all personal loans, and the defendant promised at that time to cancel his other paper, including the chattel mortgage he took to cover the down payment, but they were not canceled.

9. The plaintiff, on or about 4th or 5th of August 1952, went to the defendant to pay him some money but refused to do so because the defendant would not give him a receipt for it. The plaintiff testi-

fied, " * * * I knew he was misapplying the sums I gave him. I knew he was applying them on the personal debt when I wanted them to be applied on the laundry debt. * * * I told him I was putting all the money in the bank until he, we, reached an agreement as to how we were going to apply it, and I did deposit the money that I had. * * * I told him I was going to the bonding company. At this, Mr. Bennett told me, 'I got you right where I want you and you'll work for me like I say!' "

On or about 6 August 1952 the defendant inventoried the laundry on the truck used by the plaintiff and the plaintiff stopped picking up laundry for Mr. Bennett. The evidence further shows that the defendant thereafter deposited a check for $106.65 which had been given to the defendant on 25 March 1952 at his request for an amount due the defendant by the plaintiff on the laundry account and which the evidence tends to show had been paid in full by the plaintiff in cash. The defendant also deposited one of the checks for $125.00 theretofore given on 14 March 1952 in connection with the loan from the bank in the sum of $250.00. These checks were introduced in evidence and show that they had been endorsed by the City Laundry and M. F. Bennett and paid on 7 August 1952. The evidence further shows that an additional deposit was made to plaintiff's account in order to procure payment of the foregoing checks. The evidence is to the effect, however, that the defendant, on 7 August 1952, got all the money the plaintiff had deposited in the bank, which the plaintiff intended to hold until the defendant agreed to accept it and apply it to the proper account.

10. The plaintiff, a citizen and resident of Columbus, Ohio, and who first came to North Carolina as a member of the Marine Corps and was stationed at Cherry Point, returned to Columbus, Ohio and went to work for his father in a cabinet shop. Thereafter, he was notified by the National Surety Company that the defendant and Dixie had filed a claim under his bond for $840.00. Only the sum of $47.00 was claimed by Dixie and the balance by the defendant. The plaintiff advised the Surety Company of the circumstances surrounding the issuance of the bond and his experience with the defendant.

11. In December 1952 the plaintiff was arrested and imprisoned in Columbus, Ohio, until he could make bond. He was arrested on a warrant caused to be issued by the defendant by the Clerk of the Recorder's Court for Craven County, charging him with having embezzled funds from the defendant and Dixie.

After a hearing in Ohio, the Governor refused to extradite plaintiff to North Carolina to stand trial on the charges. However, the plain-

tiff voluntarily returned to North Carolina to stand trial. At the criminal trial in the Superior Court of Craven County, September Term 1954, the Presiding Judge directed a verdict of not guilty at the close of the State's evidence.

S. W. Moore, a stockholder and the secretary and treasurer of Dixie, testified that he had a conversation with the defendant in the present case at or about the time Mr. Gray, the plaintiff, was charged with embezzling funds from Dixie; that he pointed out to Mr. Bennett that in his belief "Mr. Gray was not guilty of the criminal charge of embezzlement, and * * * if he brought him to trial on such a charge" he would so testify. Later, when it appeared that Mr. Moore was going to testify for Mr. Gray in the criminal trial, the defendant herein said, "I'll do anything at all against you if you testify for Mr. Gray." He likewise tried to intimidate this witness before the trial in the present action.

At the close of plaintiff's evidence in the trial below the court sustained the defendant's motion for judgment as of nonsuit. Plaintiff appeals, assigning error.

*Ward & Ward for plaintiff.*
*Cecil D. May, Ward & Tucker for defendant.*

DENNY, J.   In our opinion, if it should be conceded that the employer-employee relationship existed between the plaintiff and the defendant at the time complained of, the evidence adduced in the trial below is sufficient, if believed by the jury, to support a finding of want of probable cause.

Even so, the contract under which the plaintiff worked and the course of the business as actually conducted pursuant thereto, created the relation of debtor and creditor only. *S. v. Covert,* 14 Wash. 652, 45 P. 304; *Dixie Fire Ins. Co. v. Nelson,* 128 Tenn. 70, 157 S.W. 416; *S. v. Carr,* 169 Wash. 56, 13 P 2d 497; *Chicago Fire & Marine Ins. Co. v. Fidelity & Deposit Co.,* 41 Ariz. 358, 18 P 2d 260.

In the case of *S. v. Covert, supra,* the factual situation, including the manner in which the business was actually conducted, was almost, if not identical to that in the present case. Covert was employed to work as a driver and collector by the owner of the laundry. He was to receive for his services 22 per cent of the amount of laundry work brought in by him. He was permitted to retain the 22 per cent out of the monies in his hand as soon as the same came into his hand, and to turn in the balance to the laundry. The owner testified, "The laundry brought in by each driver was charged to him." He further

testified "that he had told the drivers, including the appellant, that if they trusted anyone, and failed to turn in the money, he would hold them personally responsible for the laundry so charged to them. * * * The cash turned in was not credited to the patrons of the laundry; * * * no account was kept between the laundry and its patrons, but an account was kept between the laundry and the drivers, and on this account the drivers were charged with the bundles brought in by them (according to a fixed schedule of prices), and were credited with 22 per cent of the amount of the goods they handled, and also with such amounts of cash as they from time to time paid." The Court said: "The books at all times showed the amount due from the appellant to the laundry, but not that any sums were due from any of its customers to it. Whether appellant succeeded in collecting the sums owing by patrons for laundry work, or wholly failed to make such collections, was a matter of indifference to the complaining witness, according to the contract between them; and, as already noticed, the work done was charged not to the patrons, but to the appellant, and he was held responsible for the amounts so charged, whether collected by him or not." The Court held that the relation between the owner of the laundry and its driver was that of debtor and creditor and not principal and agent.

It is said in 18 Am. Jur., Embezzlement, section 20, page 580: "Generally, when dealings between two persons create a relation of debtor and creditor, a failure of one of the parties to pay over money does not constitute the crime of embezzlement. For example, a laundry agent who is paid by commissions and who is charged with the entire amount of laundry work done stands in the relation of debtor to the laundry company. He holds money collected in such capacity and cannot be convicted of embezzlement."

In light of the facts revealed on this record, and the authorities cited herein, the judgment as of nonsuit entered below is

Reversed.

HIGGINS, J., not sitting.