**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

DWAYNE LEQUIRE,
            *Defendant-Appellant.*

No. 11-10066

D.C. No.
4:08-cr-00212-DCB-
BPV-4

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
February 16, 2012—San Francisco, California

Filed March 5, 2012

Before: A. Wallace Tashima and Barry G. Silverman,
Circuit Judges, and Lynn S. Adelman, District Judge.*

Opinion by Judge Silverman

*The Honorable Lynn S. Adelman, District Judge for the U.S. District Court for the Eastern District of Wisconsin, sitting by designation.

---

**COUNSEL**

Barry J. Pollack, Miller & Chevalier Chartered, Washington D.C., for the defendant-appellant.

Gary M. Restaino, United States Attorney Office, District of Arizona, for the plaintiff-appellee.

---

**OPINION**

SILVERMAN, Circuit Judge:

One cannot be guilty of embezzlement if the alleged victim did not own the funds that were supposedly embezzled. In this case, an insurance agency had a contract with an insurance company that allowed the agency to commingle collected insurance premiums with its other funds in its general operating account. The contract also obligated the agency to remit the total amount of premiums due the company each month, whether or not the agency had collected the premiums. Furthermore, if the agency were delinquent in the amount it was to remit to the company, interest would accrue monthly on the unpaid balance. The government contends that the premiums collected by the agency were the property of the insurance company and held "in trust" by the agency; it alleges that when the funds were not remitted but used for other purposes, they were embezzled by the agency's treasurer, defendant Dwayne Lequire.

We hold today that under long-standing Arizona law, the contract between the agency and the company, which permitted agency commingling, required monthly agency payments whether premiums were collected or not, *and* created a right to interest on late payments, created a creditor-debtor relationship, not a trust. The agency had contractual and fiduciary duties to the company, but was not a trustee. Because the funds in question were not held "in trust" by the agency as a matter of law, an essential element of embezzlement was lacking. We reverse the denial of the defendant's motion for judgment of acquittal.

## I.  *Background*

Lequire was charged with ten counts of embezzlement of insurance premiums, in violation of 18 U.S.C. § 1033(b)(1), and one count of conspiracy to commit embezzlement.

Patriot Insurance Agency, owned by former Congressman Rick Renzi and his wife Roberta and regulated by the Arizona Department of Insurance, brokers property and liability insurance through insurance underwriters at group rates to nonprofit organizations. During the relevant time period, defendant Lequire was Patriot's treasurer.

After he was elected to Congress in 2002, Renzi placed Patriot in his wife's name but stayed involved with the company. Testimony established that Renzi was in charge; he instructed Patriot's staff whom to pay and when to pay them.

In 2005, Renzi, with Lequire's help, formed Spirit Mountain Insurance Company. Spirit was formed as a "risk retention group," a way for similarly situated entities, like the nonprofit groups for whom Patriot brokered policies, to self-insure against risk. Though licensed in the District of Columbia, Spirit was able to operate nationally. Lequire was Spirit's treasurer as well.

Spirit contracted with Risk Services, LLC to serve as captive manager for Spirit. As captive manager, Risk Services was responsible for handling Spirit's regulatory filings, accounting and financial reporting, and various legal and administrative services. Risk Services was also the conduit between Spirit and the D.C. Department of Insurance, Securities and Banking (DISB). Risk Services was independent from Spirit and Patriot, though it had one overlapping director. Neither Lequire, Renzi, nor Renzi's wife had a role in Risk Services.

Patriot and Spirit entered into a Program Administrator Agreement, an agency agreement signed by Roberta Renzi for Spirit and Lequire for Patriot. As Spirit's program administrator in Arizona, Patriot performed policy-related services for Spirit including underwriting, paying claims, and charging and collecting premiums. Pursuant to the Agreement, Patriot collected insurance premium payments from policyholders insured by Spirit and made monthly payments to Spirit.

For purposes of this appeal, the pertinent provisions of the Agreement between Patriot and Spirit are as follows:

> Section 7
> *Receipt of Funds: Accounts*
>
> A.   [Patriot] shall hold all funds received by it in connection with the Agreement as a fiduciary of [Spirit]. [Patriot] shall, under no circumstances, make any personal or corporate use of such funds not authorized by this Agreement. [Patriot] may deposit said funds into its general operating account (the "Agency Account") which may include premiums due to other carriers and commissions due to [Patriot].
>
> B.   [Patriot] shall be responsible for collecting and paying to [Spirit] all premiums due on the business

written pursuant to this Agreement. Failure to collect shall not operate as a defense against full payment by [Patriot] to [Spirit] of all amounts due and owing to [Spirit] for all liability assumed by [Spirit] . . . .

C.  1. [Patriot] shall, on a monthly basis, transfer all amounts due to [Spirit] . . . .

3. No later than fifteen (15) days after the close of each calendar month, [Patriot] shall prepare and submit to [Spirit] a report . . . listing gross premiums written for all policies issued in the previous accounting month, less return premiums and cancellations, reconciliations to previous monthly reports and [Patriot] commissions (hereinafter referred to as the "Account Current")[.]

. . .

5.  In the event that amounts transferred from the Company [sic — probably Agency] Account to [Spirit's] home office account are not sufficient to pay the total net premium due [Spirit] as shown on [Patriot's] Account Current, upon written notice from [Spirit] stating the additional amount due, [Patriot] shall promptly remit all further premium due and owing, irrespective of whether [Patriot] has collected it, within two (2) days following written notice from Spirit. If payment is not made within two (2) days of written notice, interest on amounts owing will accrue at a rate of 1.5% per month; and

6.  [Spirit] shall have a first lien upon commissions and/or service fees due under this Agreement for any indebtedness of [Patriot] to

[Spirit], including premiums, and the right of [Patriot] or any other person to receive commissions shall at all times be subordinate to the right of [Spirit] to offset commissions against any indebtedness of [Patriot] to [Spirit]. . . .

At Renzi's direction, Patriot promptly deposited premium checks received from its clients into Patriot's general operating account. Through July 2006, Patriot stamped premium checks it received "For Deposit Only, Patriot Insurance Agency, Inc. Trust Account," but there was no trust account. After July 2006, Patriot stopped using the rubber stamp, and continued to deposit the premium checks into its general operating account.

Patriot routinely failed to pay the premiums over to Spirit on a timely basis. Instead, Lequire, over a two-year period, transferred the premium funds to Renzi's personal account and Renzi used those funds to pay for personal expenditures. In all, Lequire transferred over $750,000 to Renzi at a time when Patriot had less in its bank accounts than it owed Spirit.

The entire time that Patriot was delinquent in its payments to Spirit, Lequire submitted accurate reports to Risk Services showing Patriot's delinquency. Risk Services then reported the delinquent payments to DISB. Even though Patriot was unabashedly delinquent in timely paying Spirit, neither Spirit, Risk Services, nor DISB ever invoked the 1.5% penalty interest clause.

A number of witnesses, several with no firsthand knowledge of the Agreement, testified regarding their personal beliefs as to the nature of Spirit and Patriot's relationship. Officials at Risk Services and DISB testified that they believed Spirit had a fiduciary relationship with Patriot and an official at DISB testified that she would not have approved a program administrator agreement without a fiduciary clause. Others opined that, although there is no Arizona statute

requiring Patriot to be Spirit's fiduciary, the practice in Arizona amongst brokers is to be "trustworthy and responsible" and to treat premium funds as not their own.

After the jury found Lequire guilty of the conspiracy charge and eight of the ten embezzlement counts, Lequire moved for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. Lequire argued that as a matter of law and fact there was no trust relationship between Patriot and Spirit as required for a § 1033(b)(1) violation under embezzlement. The argument was that if the money was not actually held "in trust," it was not Spirit's money, and therefore could not be embezzled from Spirit. The district court denied the motion, ruling that there was sufficient evidence to support the jury's finding that a fiduciary relationship of trust existed between Patriot and Spirit.

## II.   Analysis

### A.   Jurisdiction and Standard of Review

This court has jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's denial of a Rule 29 motion *de novo*. *United States v. Goyal*, 629 F.3d 912, 914 (9th Cir. 2010). Similarly, we review sufficiency of the evidence challenges *de novo*. *United States v. Sarkisian*, 197 F.3d 966, 984 (9th Cir. 1999). We decide "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (quotation marks omitted).

### B.   Discussion

**[1]** The crime of embezzlement of insurance premiums in set forth in 18 U.S.C. § 1033(b)(1): "Whoever [ ] acting as, or being an officer, director, agent, or employee of, any person

engaged in the business of insurance . . . willfully embezzles, abstracts, purloins, or misappropriates any of the moneys, funds, premiums, credits, or other property of such person so engaged shall be punished . . . ."

**[2]** The statute uses the word "embezzles" without definition. However, the cases define embezzlement as "the fraudulent appropriation of property by a person to whom such property has been *entrusted*, or into whose hands it has lawfully come." *United States v. Eriksen*, 639 F.3d 1138, 1145 (9th Cir. 2011) (emphasis added); *Woxberg v. United States*, 329 F.2d 284, 290 (9th Cir. 1964); *see also United States v. Andreen*, 628 F.2d 1236, 1241 (9th Cir. 1980).

Although federal law defines embezzlement, whether a person's property is held "in trust," or is not even that person's property at all, is a question of state law. In *United States v. Lawson*, 925 F.2d 1207, 1209-10 (9th Cir. 1991), we looked to state law to determine whether an auctioneer holds auction proceeds as a bailee or as a debtor; if the auctioneer was a bailee he could have been guilty of embezzlement. For the same reason, here, we look to Arizona law to determine whether Patriot held the premiums "in trust" for Spirit, or merely had a contractual obligation to remit certain amounts due each month. *See id.* at 1210; *see also United States v. Taylor*, 867 F.2d 700, 702-03 n.2 (D.C. Cir. 1989) (adopting general definition of embezzlement but noting that "federal courts look to state property laws in defining underlying concepts of ownership for the purpose of deciding whether a defendant violated a federal criminal statute").

**[3]** Both parties agree that Spirit's premiums must have been held in trust by Patriot for Lequire to be guilty of embezzlement. If they were not, the relationship was a debtor-creditor one and there could be no embezzlement. *See United States v. Dupree*, 569 F.2d 1061, 1064 (9th Cir. 1978) ("[T]he property simply did not belong to one other than the defendant and therefore could not have been embezzled by him.").

We agree with Lequire that as a matter of Arizona law, Patriot was a debtor of Spirit, not a trustee.

**[4]** First of all, Arizona law does not *require* an insurance broker to hold funds in trust for an insurance company. Whether funds are held in trust depends on the terms of the particular contract. Here, the Agreement states that "[Patriot] shall hold all funds received by it in connection with this Agreement as a fiduciary of [Spirit]. [Patriot] shall, under no circumstances, make any personal or corporate use of such funds not authorized by this agreement." Conspicuously missing from the Agreement is any mention of "a trust," of property being "entrusted," "held in trust," of Patriot being a "trustee," or any other variant of the word.

**[5]** There is no doubt that Patriot is a fiduciary of Spirit, but that does not necessarily make it a trustee. A trust is a "a fiduciary relationship with respect to property." Restatement (Third) of Trusts § 2 (2003). However, "the trust relationship is one of many forms of fiduciary relationships" including: "guardian-ward, agent-principal, attorney-client, and partnership relations." *Id.* § 2*b*. We have explained, in no uncertain terms, that the two terms are not synonymous. As we said in *Joseph Rosenbaum, M.D., Inc. v. Hartford Ins. Co.*, 104 F.3d 258, 262 (9th Cir. 1996), "[a] trustee is a person who holds some res in trust for a beneficiary. The class of fiduciaries is much more inclusive . . . ." (citation omitted). Although a trustee is always a fiduciary, a fiduciary is not always a trustee.

**[6]** The main problem for the government here is that under Arizona law, when an insurance agent is allowed by contract to commingle funds in a single account *and* has the duty to pay over premiums to the insurance company *regardless of whether the premiums have actually been collected*, as a matter of law no trust relationship exists; what exists is a debtor-creditor relationship. *See Chi. Fire & Marine Ins. Co. v. Fid. & Deposit Co. of Md.*, 18 P.2d 260, 262 (Ariz. 1933).

In *Chicago Fire*, Chicago Fire was an insurance company that used Macmillan as its general agent for Arizona. *Id.* at 260. Macmillan executed an indemnity bond in which he agreed to pay Chicago Fire for any loss resulting from embezzlement and agreed to: "carry out faithfully all instructions given or to be given [by Chicago Fire] and [to be] responsible to [Chicago Fire] for all transactions and all balances due by his office . . . ." *Id.* at 261. The premiums collected by Macmillan on Chicago Fire's behalf were permissibly commingled with other premiums collected on behalf of other insurers. *Id.* Macmillan was also liable for the insurance premiums owed to Chicago Fire whether they had been collected or not. *Id.* Chicago Fire did not care how the premiums were handled or whether they had been collected. *Id.*

[7] The question before the Arizona Supreme Court was whether the premiums Macmillan received were held in trust for Chicago Fire, or whether Chicago Fire and MacMillan had only a debtor-creditor relationship. *Id.* The court held that, because premiums could be commingled and Macmillan was obligated to pay the premiums written, regardless of how much was collected, there was no trust as a matter of law. *Id.* at 262. That being the case, "there could be no embezzlement." *Id.*

[8] We reject the argument that *Chicago Fire* is an outlier case from a bygone era. To the contrary, our recent caselaw is consistent with the proposition set forth in *Chicago Fire* that commingling *and* a requirement to pay give rise to a debtor-creditor relationship. In *Foothill Capital Corp. v. Clare's Food Market, Inc.* (*In re Coupon Service*), 113 F.3d 1091, 1100 (9th Cir. 1997), retailers argued that a coupon clearinghouse held its coupon proceeds in trust. We held that there was no trust relationship because the clearinghouse was required to make payments to the retailers on a fixed schedule regardless of when manufacturers paid the clearinghouse and the clearinghouse was allowed to commingle payments with its own general funds. *Id.* at 1101.

**[9]** Here, like in *Chicago Fire* and *In re Coupon Service*, the Agreement allowed Patriot to commingle premium payments in its general operating account. And also like the situation in *Chicago Fire* and *In re Coupon Service*, Patriot was required to pay Spirit premiums owed regardless of whether or not they had been collected. In addition, if Patriot did not timely pay the premiums, interest would begin accruing at 1.5% per month, making the case for a debtor-creditor relationship even stronger than in either of the other two cases. If interest is due on unremitted amounts, "it becomes close to certain that the relationship is a debt rather than a trust." Restatement (Third) of Trusts § 5*k*; *see also In re Estate of Zilles*, 200 P.3d 1025, 1031 (Ariz App. 2008) (noting that Arizona courts generally follow the Restatement (Third) of Trusts when not bound by previous decisions or legislative enactments).

The government argues that *Chicago Fire* and *In re Coupon Service* are inapposite to this case because neither case had a fiduciary clause or expressly prohibited use of the collected funds by the alleged trustee. First, as we have seen, the fact that Patriot was admittedly a fiduciary does not mean it was also a trustee. *See Matter of Shulman Transp. Enters. Inc.*, 33 B.R. 383, 386 (S.D.N.Y. 1983) (holding that even though agreement between parties designated funds as "property of the carrier," only a debtor-creditor relationship existed because commingling was allowed and the agent was liable whether or not it had already received payment from the customer). To reiterate, many — indeed most — fiduciaries are not trustees. Second, the fact that the Agreement contained a clause prohibiting personal and corporate use of funds alone is insufficient to prove a trust, as opposed to it being a contractual restriction. In *Lawson*, 925 F.2d at 1209-10, we held that even though a statute required auctioneers to keep auction proceeds separate from personal funds, the auctioneer had a debtor-creditor relationship with the owner of the property because he could commingle the proceeds from all auctions and he was not required to remit the *actual* auction proceeds

— just the *amount* of the proceeds. In fact, in *In re Coupon Service,* the clearinghouse was prohibited from personal use of collected funds; it lacked the authority to commingle proceeds with its general operating fund or to pledge the funds as security. Still no trust. 113 F.3d at 1100.

Because being a fiduciary does not *ipso facto* create a trust relationship, the majority of the evidence the government cites — including the testimony of witnesses opining that Patriot had fiduciary and "trustworthiness" obligations towards Spirit — is irrelevant to the crucial question: whether the Agreement created a trust. *See United States v. Christiansen*, 958 F.2d 285, 287 (9th Cir. 1992) ( "[A] [f]inding [of] breach of trust is essential to an embezzlement conviction."). This case turns on the applicability of *Chicago Fire*, not on the opinion of various witnesses. *Chicago Fire* either controls as a matter of law, or it does not. We hold that it does.

The fact that for a period of time Patriot endorsed checks deposited into its general account using a rubber stamp containing the words "trust account" is of no significance. First of all, there *was* no separate "trust account;" it is undisputed that the funds were deposited into a commingled general account. More importantly, this case turns on the terms of the contract between the parties and not on what was, or was not, on Patriot's endorsement stamp. For example, if the Agreement had in fact created a trust, Lequire's use of an endorsement stamp claiming the funds to be his own would not have saved him.

The district court, in its Rule 29 order, ruled that commingling did not preclude a trust relationship because Patriot was obligated to keep an accounting of all gross premiums collected and any deductions taken. It is true that money can be converted despite commingling if the funds can be identified, segregated, and an obligation to treat it in a specific manner can be established. *See Stokes v. Stokes*, 694 P.2d 1204, 1208 (Ariz. App. 1984). No one contends that the right to commin-

gling, in and of itself, negates a trust relationship. However, the key to *Chicago Fire* was the confluence of *both* the right to commingle *and* the debtor's obligation to the creditor regardless of whether premiums had been collected. It was the combination of these two factors that "destroys any idea of a trust." 18 P.2d at 262.

The district court also relied on Spirit Mountain's security interest in Patriot's future commissions and fees to find that Spirit had a sufficient ownership interest to sustain Lequire's embezzlement conviction. This rationale fails, however, because Spirit's security interest was in *future commissions and fees*, not in the premiums collected. The district court's reliance on *Case v. Gerhke*, 91 P.3d 362, 366 (Ariz. App. 2004), is misplaced because there the party did indeed have a valid security interest in the funds in issue. Not so here.

### III.   *Conclusion*

[10] In summary, we hold that the funds in Patriot's possession were not held in trust because the Agreement allowed for commingling, required premium payments to be paid to Spirit regardless of whether or not Patriot had collected them, and allowed Spirit to collect an interest on late premium payments. Because Patriot did not hold premium payments "in trust," Lequire cannot be guilty of embezzlement.[1]

For the foregoing reasons, the judgment of the district court is REVERSED and the case is REMANDED for entry of judgment of acquittal on all counts.

---

[1]Having decided this case on the basis indicated, we do not reach the other arguments advanced by Lequire.